STATE OF NORTH CAROLINA v. MARYLIN RUDD MAHALEY

No. 2A91

(Filed 19 November 1992)

1. **Evidence and Witnesses § 1240 (NCI4th) — murder — incriminating statement — no Miranda warning — not in custody**

The trial court did not err by concluding that a murder defendant was not in custody for *Miranda* purposes when she gave three statements at the police station where the police first spoke with defendant at her home; she agreed to accompany them to the police station, where she was interviewed; defendant was returned to her home; her home was searched for the second time and she agreed to return to the police department for another interview; and defendant was interviewed for a third time when an officer approached her in the snack room of the police station approximately two hours after the second interview and told her that he believed that she knew more than she was telling. The court's findings were amply supported by substantial evidence tending to show that defendant never indicated that she wanted to terminate an interview, that the officers continuously informed the defendant that she was free to leave at any time during the inter-

views, and that she understood that she was free to go and was not required to make a statement.

**Am Jur 2d, Criminal Law §§ 793, 794.**

2. **Evidence and Witnesses § 1143 (NCI4th) — murder — testimony of co-conspirator — evidence of conspiracy**

The trial court did not err in a murder prosecution by admitting testimony from a co-conspirator implicating defendant where there was sufficient independent evidence that defendant had conspired to kill her husband in that defendant and Steve Harris were involved in an affair at the time of the murder; defendant admitted that she had called Harris and told him that her husband was asleep on the living room floor; and Eric Taylor testified that defendant opened the carport door so that he and Harris could enter and kill defendant's husband.

**Am Jur 2d, Homicide § 346.**

3. **Evidence and Witnesses § 1151 (NCI4th) — murder — testimony of co-conspirator — statements made after conspiracy formed**

The trial court did not err by admitting the testimony of a co-conspirator regarding statements made by another co-conspirator incriminating defendant where defendant contended that the statements were made before the conspiracy was formed, but the evidence tended to show that the conspiracy was formed at least one week prior to the actual murder. Eric Taylor testified that Steve Harris aborted the plan to kill defendant's husband after defendant told Harris that she was not ready on the weekend prior to the actual murder and it was uncontroverted that all of Harris's statements to Taylor regarding the murder and about which Taylor testified were made after that weekend.

**Am Jur 2d, Homicide § 346.**

4. **Evidence and Witnesses § 351 (NCI4th) — murder — defendant's prior bad acts — admissible**

The trial court did not err in the prosecution of defendant for murdering her husband by admitting evidence regarding defendant's admission to two drug treatment facilities, her theft of credit cards and money, and her affair with a co-conspirator. Evidence of defendant's relationship with the co-

conspirator was highly probative of her motive for wanting her husband murdered, and evidence of defendant's theft of money and credit cards and evidence of her drug problems tended to show that she needed money which she would gain from insurance proceeds upon her husband's death.

**Am Jur 2d, Evidence § 366.**

5. **Evidence and Witnesses § 1694 (NCI4th)— murder— photographs of victim—location and appearance**

The trial court did not err in a murder prosecution by admitting into evidence photographs of the victim to illustrate the testimony of the medical examiner with respect to the location and condition of the body. Each photograph illustrated different testimony, none was especially gruesome or inflammatory, and the total amount of photographic evidence was not excessive.

**Am Jur 2d, Homicide §§ 417-419.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

6. **Homicide § 240 (NCI4th)— first degree murder—conspiracy— sufficiency of evidence**

The trial court did not err in submitting a charge of first degree murder to the jury where defendant told officers that she and Steve Harris were involved in an affair and that she called Harris on the night of the murder to tell him that her husband was asleep on the living room floor; there was evidence that defendant opened the carport door for the men who strangled her husband; and there was substantial evidence that defendant did so in furtherance of a conspiracy to murder her husband.

**Am Jur 2d, Homicide § 529.**

7. **Criminal Law § 1355 (NCI4th)— murder—capital sentencing— no significant history of prior criminal activity—failure to submit error**

The trial court erred during the capital sentencing portion of a murder prosecution by failing to submit the mitigating circumstance of no significant history of prior criminal activity where the evidence showed no record of criminal convictions and evidence of prior history of criminal activity was limited

to evidence tending to show her use of illegal drugs and her theft of money and credit cards to support her drug habit. The evidence did not establish that the defendant had such a significant history of prior criminal activity that no rational jury could find the existence of the statutory mitigating circumstance and there was prejudice even though the court submitted the nonstatutory mitigating circumstances that "the defendant has no history of violence or physical injury to others" and "the defendant has no record of criminal convictions" because the jury was not required to give any weight to such nonstatutory mitigating circumstances and would have been required to give the statutory mitigating circumstance value. Furthermore, it cannot positively be said that had this statutory mitigating circumstance been found and balanced against the aggravating circumstances, the jury would still have returned a sentence of death.

**Am Jur 2d, Homicide § 554.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment and sentence of death upon the defendant's conviction of first-degree murder, entered by Allen (J. B.), J., in the Superior Court, Alamance County, on 17 December 1990. Heard in the Supreme Court on 9 September 1992.

*Lacy H. Thornburg, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Jonathan D. Sasser and Loni S. Caudill, for the defendant-appellant.*

MITCHELL, Justice.

The defendant Marylin Rudd Mahaley was indicted for the murder of her husband Roy Mahaley and was tried capitally at the 26 November 1990 Criminal Session of the Superior Court, Alamance County. The jury found the defendant guilty of first-degree murder on the theory that she acted in concert with Steve Harris. After a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court entered a sentence of death.

On appeal, we conclude that the defendant's trial and conviction were free from error. However, during the capital sentencing

STATE v. MAHALEY

[332 N.C. 583 (1992)]

proceeding the trial court erroneously failed to submit the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity. Therefore, the sentence of death entered against the defendant must be vacated and the case remanded to the Superior Court for a new capital sentencing proceeding.

The evidence introduced at trial tended to show the following. On Monday, 19 March 1990, at approximately 8:00 a.m., Detective Phil Ayers of the Alamance County Sheriff's Department was dispatched to Map Enterprises, in Burlington, to investigate a report of a body found in the trunk of a car. The body was that of Roy Mahaley. At approximately 9:00 a.m., after examining the scene, Detective Ayers and several other officers arrived at Roy Mahaley's home. The defendant Marylin Mahaley greeted the officers and permitted them to enter the house.

After stating that she had not seen her husband since early Saturday morning, the defendant gave Detective Ayers permission to search the house. During the search, Detective Ayers noticed two insurance policies on a roll-top desk and blood on the carpet. Throughout the search, the defendant did not ask the officers why they were there, and the officers did not tell the defendant that her husband was dead. After searching the defendant's home, Detective Ayers told the defendant that her husband was dead. However, Detective Ayers noted that the defendant showed no signs of grief upon hearing this news.

After conferring with Detective Dean Batchelor of the Burlington Police Department, Detective Ayers asked the defendant if she knew either Steve Harris or a man named Eric. Initially, the defendant denied knowing either of them. However, when Detective Ayers asked again, the defendant admitted that she knew Steve Harris and that he was her boyfriend. After the search was completed, Detective Bennie Bradley asked the defendant to accompany him to the police department in order to complete the investigation. The defendant and the police officers arrived at the Burlington Police Department at approximately 11:43 a.m., and Sergeant Kevin Crowder interviewed the defendant. The interview ended at 12:52 p.m. Sergeant Crowder testified that the defendant appeared calm and coherent throughout the interview.

The officers drove the defendant home at 1:18 p.m., and she signed a written consent allowing the officers to conduct a second search of her home. During the search, the defendant gave the

officers her husband's blood-stained shirt and T-shirt, stating that he had been involved in a fight on Friday night. After the search, Sergeant Crowder asked the defendant if she would accompany them to the Police Department and she obliged.

The second interview of the defendant began at 3:27 p.m. and ended at 6:48 p.m. with the defendant providing a handwritten statement. The defendant told the officers that Steve Harris and Roy Mahaley had fought at Steve's hotel room on Friday night. The defendant stated that Steve Harris had told her that Roy had returned to his hotel room on Saturday night and that they had fought again. The defendant further stated that Steve Harris had told her that he had hurt Roy severely and then placed Roy in the trunk of Roy's car and left the car at Map Enterprises.

After the defendant's second interview ended at 6:48 p.m., she remained in the snack room at the police department while the officers continued the investigation. At approximately 9:00 p.m., Detective Steve Lynch went into the snack room to speak with the defendant. Detective Lynch told the defendant that he believed that she had more information than she had previously disclosed. In response to this statement, the defendant started crying and acknowledged that he was correct. The defendant then stated that she would talk to Detective Lynch and Agent Dave Hedgecock. They then conducted a third interview of the defendant which was taped in Lynch's office.

During the third interview, the defendant stated that Roy Mahaley went to the Knights Inn on Friday night to fight with Steve Harris. After noting that Saturday was an unremarkable day, the defendant stated that Roy was not home when she woke up on Sunday morning and that she thought that he was at work. A few hours later, Steve Harris called the defendant and asked her to come to his hotel room, and she went to visit him for approximately thirty minutes. At approximately 8:00 p.m., Steve Harris called the defendant again and told her that he had tried to convince Roy to come over to his hotel room so that the three of them could talk, but Roy refused. Harris also told the defendant that later that evening he got a ride to the Mahaley home where he found the door unlocked and Roy asleep on the floor. Harris then told the defendant that he had choked Roy with a necktie, placed Roy in the trunk of his car, and driven him to Map Enterprises and left.

STATE v. MAHALEY

[332 N.C. 583 (1992)]

After discussing Roy's death, the defendant told the officers that she met Steve Harris at Oakleigh Drug Treatment Center in Durham. The defendant also told the officers that she and Steve Harris had been dismissed from the treatment program because they were sneaking around to see each other. The defendant further noted that she had left Roy on several occasions to live with Harris. After taking the defendant home that night, Agent Hedgecock went to Eric Taylor's home and asked him some questions. As a result of Taylor's statement, Taylor and the defendant were arrested.

After she was arrested and advised of her constitutional rights, the defendant gave the following statement. The defendant stated that she called Steve Harris between 10:00 and 10:30 p.m., and he told her that he had talked to Roy regarding the three of them getting together. The defendant stated that she told Harris that she wanted to stay with Roy. At that point, Harris asked the defendant what Roy was doing, and she told him that Roy was asleep on the floor. In response to this information, Harris informed her that he and Taylor were coming over and that he did not know what was going to happen. After Harris and Taylor arrived at the Mahaley home, the defendant opened the carport door. Harris instructed her to stay in the bedroom. Approximately thirty to forty-five minutes later, Harris entered the bedroom and told her that he had strangled Roy. Harris also told her that he and Taylor were going to take Roy's body to Map Enterprises and that they were going to wipe away their fingerprints. Before the men left for Map Enterprises, the defendant saw Harris taking money out of Roy's wallet. On the following morning, Harris called her, and she helped him move into the Scottish Inn.

Eric Taylor, who had entered into a plea arrangement with the prosecution, testified that he met Steve Harris while they were working at the Innkeeper Motel in the Fall of 1989. Taylor occasionally would go to Harris' hotel room to drink, smoke marijuana and play video games. In late February 1990, Harris wrote a check payable to Taylor in the amount of $950 on the account of Roy Mahaley, and Taylor cashed this check. During this same period, Harris started talking about harming Roy Mahaley. Harris told Taylor that he would pay Taylor $25,000 from the proceeds of Roy Mahaley's life insurance if Taylor would assist him in killing Roy. During the week of the killing, Harris told Taylor that he wanted to kill Roy because the defendant had said that Roy was investigating the forged check.

On the night of the murder, Taylor called Harris. Harris told him that he and Roy Mahaley had had an altercation and that he had injured Roy severely. Harris also told Taylor that he would have to kill Roy Mahaley that night. In response to Harris' request, Taylor went to Harris' room at approximately 8:00 p.m., where they drank beer and smoked marijuana. At approximately 8:30 p.m., Harris called the defendant and told her to put out Roy's clothes so that he could dress Roy's body after killing him. Harris also told the defendant to call him back when Roy was asleep. At approximately 10:30 p.m., the defendant telephoned Harris and told him that Roy was asleep.

As Harris and Taylor approached the Mahaley carport, they observed Roy Mahaley lying on the floor in the den. At that point, the defendant opened the door for them, and Harris told her to go back into the bedroom and wait. Harris walked over to Roy and strangled him with a necktie. While Harris was choking Roy, the necktie broke, so Harris used a blanket and a cord to finish the task. After killing Roy, Harris dressed the body in work clothes and put it in the trunk of Roy's car. Harris then put the necktie, the blanket, and a copy of the forged check into a paper bag. After placing Roy's body in the trunk, Harris took money from Roy's wallet and gave $150 to Taylor and the rest to the defendant.

Harris wanted to leave Roy's car in a bad neighborhood so that the police would suspect robbery as the motive for Roy's death. However, the defendant recommended that the car be left at Map Enterprises because it would raise less suspicion. In response to the defendant's recommendation, Harris and Taylor left the car at Map Enterprises and returned to the defendant's home. Upon returning to the defendant's home, Taylor noted that the defendant seemed relieved. As Harris and Taylor prepared to leave, the defendant thanked Taylor for helping them, and she gave Harris a kiss.

Other evidence introduced at trial is discussed at other points in this opinion where pertinent to the issues raised by the defendant.

[1] By her first assignment of error, the defendant contends that her statements were obtained in violation of principles explained in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), because the officers did not advise her of her constitutional rights before she gave the statements. In *Miranda*, the Court held that "the prosecution may not use statements . . . stemming from *custodial* interrogation of the defendant unless it demonstrates the use of

STATE v. MAHALEY

[332 N.C. 583 (1992)]

procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 16 L. Ed. 2d at 706 (emphasis added). At issue in this case is whether the defendant was in custody when she gave the three statements in question.

It is well established that the test for whether a suspect is "in custody" for Miranda purposes is whether a reasonable person in the suspect's position would feel free to leave at will or compelled to stay. *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992); *State v. Smith*, 317 N.C. 100, 343 S.E.2d 518 (1986); *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982). This objective test must necessarily be applied on a case-by-case basis, taking into account the facts and circumstances surrounding each case. *Davis*, 305 N.C. at 410, 290 S.E.2d 580.

Evidence before the trial court tended to show that the police first spoke with the defendant at her home; however, she agreed to accompany them to the police station where she was interviewed. This initial interview commenced at 11:49 a.m., and the defendant was returned to her home at approximately 1:30 p.m. Based upon evidence introduced during a *voir dire* hearing where Detective Bennie Bradley testified, the trial court made findings and concluded that the defendant was not "in custody" during the initial interview for the following reasons. While at the defendant's home, Officer Bradley asked the defendant if she would be willing to go to the Burlington Police Department for an interview, and she freely and voluntarily consented to accompany him. During the drive to the police station, the defendant was not handcuffed and she was never told that she was in custody. During the interview, the officers did nothing to coerce the defendant, and she never refused to answer any questions.

Following a *voir dire* hearing where officer Crowder testified, the trial court made findings and concluded that the defendant was not "in custody" during the second interview for the following reasons. After the initial interview, the defendant consented to another search of her home. Upon completion of this search, Detective Kevin Crowder and Agent Hedgecock asked the defendant if she would return to the Burlington Police Department for a second interview. This second interview commenced at 3:27 p.m. and ended at 6:48 p.m. with the defendant giving a written statement. There were five officers present during this interview. The defendant freely and voluntarily agreed to return to the Burlington

Police Department for the second interview. She was told that she was not under arrest and that she had the option to decline the officers' request. The defendant was told on several occasions that she was free to leave at any time during the interview. At the commencement of the second interview, the investigating officers did not consider the defendant a suspect because they did not have sufficient information with respect to the cause of Roy Mahaley's death. Before giving her written statement, the defendant signed a statement indicating that she had voluntarily returned to the Burlington Police Department and that she was aware of the fact that she was free to leave at any time during the interview.

At the close of the second interview, the defendant was taken into a snack room at the police station. At approximately 9:00 p.m., Lieutenant Steve Lynch walked into the snack room and observed the defendant sitting at a table. Lynch approached the defendant and told her that he believed that she knew more about this case than she had previously disclosed. In response to Lynch's statement, the defendant started to cry and stated that she wanted to speak with Lynch and Agent Hedgecock. Lynch and Hedgecock then conducted a third interview with the defendant in Lynch's office. This third interview took approximately fifteen minutes and was tape-recorded.

Following a *voir dire* hearing where officers Lynch and Hedgecock testified, the trial court made findings and concluded that the defendant was not in custody during this third interview for the following reasons. The defendant gave the recorded statement voluntarily as evidenced by the fact that she signed a statement to that effect. Additionally, during the interview, the defendant never indicated that she did not want to give this statement, and she never stated that she wanted to go home. Furthermore, the officers continuously told the defendant during the interview that she was not in custody and that she was free to leave at any time.

The trial court's findings of fact following a *voir dire* hearing concerning the admissibility of a confession are conclusive and binding on the appellate courts when supported by competent evidence. *Id.* The determination of whether the defendant was "in custody" at the time she confessed, however, requires the application of fixed rules of law to the facts found by the trial court and, therefore, is a conclusion of law. *Id.* at 414-15, 290 S.E.2d at 580. Such conclu-

STATE v. MAHALEY

[332 N.C. 583 (1992)]

sions are fully reviewable on appeal. *State v. McKoy*, 323 N.C. 1, 372 S.E.2d 12 (1988), *vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990); *State v. Perdue*, 320 N.C. 51, 357 S.E.2d 345 (1987). It is true that we have often stated that such conclusions of law are binding upon us on appeal if they are supported by the trial courts' findings. *E.g., State v. Wynne*, 329 N.C. 507, 406 S.E.2d 812 (1991); *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). When used in this context, however, the phrase "supported by the findings" must be taken as meaning "required by the findings" or "correct in light of the findings." Only conclusions of law which are "supported" in such manner by the findings are binding on appeal.

In the present case, the trial court's findings were amply supported by substantial evidence presented on *voir dire*. Such evidence tended to show that the defendant never indicated that she wanted to terminate an interview, that the officers continuously informed the defendant that she was free to leave at any time during the interviews, and that she understood that she was free to go and not required to make any statement. The trial court's findings were consistent with that evidence. Furthermore, those findings compelled the trial court's conclusion that the defendant was not "in custody" for Miranda purposes when she gave her three statements at the Burlington Police Department. Therefore, we conclude that the trial court did not err in this regard. The defendant's first assignment of error is without merit.

[2] In her next assignment of error, the defendant contends that the trial court erred by allowing Eric Taylor to testify about statements Steve Harris had made to Taylor which implicated the defendant in the murder of Roy Mahaley. Specifically, the defendant contends that the State failed to make the required *prima facie* showing that she conspired with Steve Harris and Eric Taylor; therefore, Harris' statements to Taylor were not admissible against the defendant.

The law is well established regarding the admissibility of statements by co-conspirators. A statement by one conspirator made during the course and in furtherance of the conspiracy is admissible against his co-conspirators. N.C.G.S. § 8C-1, Rule 801(d)(E) (1988). However, for the acts or statements of a conspirator to be admissible as evidence against his co-conspirators, there must be a showing that "(1) a conspiracy existed; (2) the acts or declarations were

made by a party to it and in pursuance of its objectives; and (3) while it was active, that is, after it was formed and before it ended." *E.g., State v. Tilley*, 292 N.C. 132, 138, 232 S.E.2d 433, 438 (1977); *State v. Lee*, 277 N.C. 205, 213, 176 S.E.2d 765, 769-70 (1970). Moreover, the State's evidence must establish "a *prima facie* case of the conspiracy independently of the statements sought to be admitted." *State v. Nichols*, 321 N.C. 616, 630, 365 S.E.2d 561, 570 (1988); *Tilley*, 292 N.C. at 138, 232 S.E.2d at 438.

In the present case, there was sufficient evidence, apart from Steve Harris' statements to Eric Taylor, to establish a *prima facie* showing that the defendant conspired with the men to murder her husband. The defendant and Steve Harris were involved in an affair at the time of the murder. Moreover, the defendant admitted that she called Steve Harris and told him that Roy Mahaley was asleep on the living room floor. As further evidence of the defendant's involvement in a conspiracy to kill her husband, Eric Taylor testified that the defendant opened the carport door so that he and Steve Harris could enter and kill Roy Mahaley. In light of the foregoing, there was clearly sufficient evidence, independent of Harris' statements to Taylor, to establish a *prima facie* showing that the defendant conspired with Harris and Taylor to kill her husband.

[3] The defendant next argues that Harris' statements to Taylor were inadmissible because they were made before any conspiracy was formed and, therefore, not during the course of and in furtherance of a conspiracy. While a *prima facie* showing of the existence of a conspiracy must be established independently of the statements sought to be admitted, the trial court may use such statements in establishing the times when the conspiracy was entered and terminated. Therefore, in passing on this issue we consider all of the evidence introduced at trial.

This Court has recognized the inherent difficulty in proving the formation of a criminal conspiracy. *See Tilley*, 292 N.C. at 139, 232 S.E.2d at 438-39 (1977) (stating that because of the nature of the offense, courts have recognized the inherent difficulty in proving the formation and activities of the criminal plan and have allowed wide latitude in the order in which pertinent facts are offered in evidence). In the present case, the evidence was not clear with respect to the exact moment when the conspiracy was formed. However, evidence tended to show that the conspiracy

was formed at least one week prior to the actual murder; Eric Taylor testified that Steve Harris aborted the plan to kill Roy Mahaley after the defendant told Harris that she was not ready to kill Roy on the weekend prior to the actual murder. Since it was uncontroverted that all of Harris' statements to Taylor regarding the murder of Roy Mahaley were made after that weekend, the evidence clearly tended to show that they were made after the conspiracy was formed.

There was substantial evidence that the defendant had entered a conspiracy to kill her husband and that Harris' statements to Taylor were in furtherance of and during the conspiracy. Therefore, the trial court did not err by admitting evidence of those statements of Harris through the testimony of Taylor. This assignment of error is without merit.

[4] The defendant next contends that the trial court erred by admitting evidence of her prior bad acts. Over the defendant's objection, various witnesses testified regarding her admission to two drug treatment facilities, her theft of credit cards and money, and her affair with Steve Harris. The defendant argues that this evidence was irrelevant and served only to inflame the jury.

While evidence of prior bad acts is not admissible to prove that a person acted in conformity therewith, it is admissible for other purposes such as proof of motive. *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990); N.C.G.S. § 8C-1, Rule 404(b) (1988). In the present case, the defendant was tried for the first-degree murder of her husband. In order to convict the defendant of this charge, the State relied upon the theory that she conspired with Eric Taylor and her boyfriend, Steve Harris, to murder her husband.

Evidence of the defendant's relationship with Harris was highly probative of her motive for wanting her husband murdered. Similarly, evidence of the defendant's theft of money and credit cards, coupled with evidence of her drug problems, tended to show that the defendant needed money which she stood to gain from the insurance proceeds due upon her husband's death. Since the evidence admitted was relevant as tending to show the defendant's motives for conspiring to murder her husband, the trial court did not err. This assignment of error is without merit.

[5] The defendant next contends that the trial court erred by admitting photographs of the victim into evidence. In order to illustrate the testimony of the medical examiner, the trial court

admitted thirteen photographs of the victim's body into evidence. The defendant contends that the probative value of these photographs was substantially outweighed by their tendency to inflame the jury. *See* N.C.G.S. § 8C-1, Rule 403 (1988).

Photographs of a homicide victim's body may be introduced into evidence to explain or illustrate testimony. *State v. Watson*, 310 N.C. 384, 312 S.E.2d 448 (1984). Moreover, photographs may be introduced into evidence even if they are gruesome so long as they are used by a witness to illustrate his testimony, and an excessive number are not used solely to arouse the passions of the jury. *State v. Murphy*, 321 N.C. 738, 365 S.E.2d 615 (1988).

In the present case, the photographs were used to illustrate the medical examiner's testimony with respect to the location and condition of the victim's body. Each photograph illustrated different testimony, none was especially gruesome or inflammatory, and the total amount of photographic evidence was not excessive. Since the photographs were not excessive in number and were used solely for the purpose of illustrating the medical examiner's testimony, the trial court did not err in admitting the photographs into evidence. This assignment of error is without merit.

[6] The defendant next assigns as error the trial court's denial of her motion to dismiss the first-degree murder charge. Specifically, the defendant contends that the trial court erred by submitting the first-degree murder charge to the jury because the evidence introduced at trial would not support any reasonable finding that she conspired to murder her husband.

In ruling on a motion to dismiss, the trial court must determine whether there is substantial evidence of each element of the offense charged. *E.g., State v. McPhail*, 329 N.C. 636, 406 S.E.2d 591 (1991); *State v. Nichols*, 321 N.C. 616, 365 S.E.2d 561 (1988). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *State v. Vause*, 328 N.C. 231, 400 S.E.2d 57 (1991); *State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980). In making its determination, the trial court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference that might be drawn therefrom. *State v. Brown*, 310 N.C. 563, 313 S.E.2d 585 (1984).

STATE v. MAHALEY

[332 N.C. 583 (1992)]

In the present case, the defendant told police officers that she and Steve Harris were involved in an affair and that on the night of her husband's murder, she called Harris to tell him that her husband was asleep on the living room floor. There was also evidence that the defendant opened the carport door for Steve Harris and Eric Taylor, the men who strangled her husband to death. Additionally, as previously discussed in this opinion, there was substantial evidence that the defendant did so in furtherance of a conspiracy that she had entered with Harris and Taylor to murder the victim. Therefore, the trial court did not err in submitting the charge of first-degree murder to the jury. This assignment of error is without merit.

[7] We conclude for the foregoing reasons that the guilt-innocence determination phase of the defendant's trial and her conviction of first-degree murder were free of error. Accordingly, we turn to the defendant's assignments of error relating to the separate capital sentencing proceeding. The defendant contends that the trial court erred during the capital sentencing proceeding by failing to submit the statutory mitigating circumstance that she has no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1) (1988). The trial court is required to determine whether the evidence will support a rational jury finding that a defendant has no significant history of prior criminal activity. *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988). If so, the trial court has no discretion; the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant. *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316, *vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988).

Evidence in the present case tended to show that the defendant had no record of criminal convictions. Evidence of prior history of criminal activities was limited to that tending to show her use of illegal drugs and her theft of money and credit cards to support her drug habit.

In *Wilson*, we held that a rational jury could find that the defendant had no significant history of criminal activity even though he had a prior conviction for the second-degree kidnapping of his wife. *Wilson*, 322 N.C. at 143, 767 S.E.2d at 604. Similarly, in *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 824 (1985), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988), we held that the trial court properly submitted this statutory mitigating

circumstance to the jury even though the defendant had prior felony convictions. *See Lloyd*, 321 N.C. at 312, 364 S.E.2d at 324 (1988) (submission of this statutory mitigating circumstance to the jury required, over the defendant's objection, notwithstanding a record showing two felony convictions and convictions for seven alcohol-related misdemeanors). The evidence in this case did not establish that the defendant had such a significant history of prior criminal activity that no rational jury could find the existence of the statutory mitigating circumstance. Therefore, we must conclude that the trial court erred by failing to submit this mitigating circumstance to the jury. *Id.*

We must now determine whether this error was harmless. In *Wilson*, we held that the failure to submit the statutory mitigating circumstance of no significant history of prior criminal activity has federal constitutional implications, so the standard for determining prejudice is N.C.G.S. § 15A-1443(b) rather than N.C.G.S. § 15A-1443(a). *Wilson*, 322 N.C. at 145, 367 S.E.2d at 605. N.C.G.S. § 15A-1443(b) provides that a violation of the defendant's federal constitutional rights is prejudicial unless the appellate court determines that it was harmless beyond a reasonable doubt, and the burden in this regard is upon the State to so prove. N.C.G.S. § 15A-1443(b) (1988).

In the present case, we must determine whether the State has carried its burden of proving that the error was harmless beyond a reasonable doubt. The fact that the trial court substituted the nonstatutory mitigating circumstances that "the defendant has no history of violence or physical injury to others" and "the defendant has no record of criminal convictions" does not satisfy the State's burden. The trial court's submission of these two nonstatutory circumstances was inadequate because the trial court gave the jury the discretion, if it found either circumstance to exist, to determine "whether you deem this to have mitigating value." As a result of this instruction, the jury was not required to give any weight to such nonstatutory mitigating circumstances. By contrast, if a jury determines that a statutory mitigating circumstance exists, it *must* give that circumstance mitigating value. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988).

In *Wilson*, we recognized that there was no way of knowing whether the failure to submit a statutory mitigating circumstance to the jury might have tipped the scales in favor of the jury deter-

STATE v. MAHALEY

[332 N.C. 583 (1992)]

mination that the aggravating circumstances outweighed the mitigating circumstances and were sufficiently substantial to call for the imposition of the death penalty. *Wilson*, 322 N.C. at 146, 367 S.E.2d at 606. "We have also recognized that common sense, fundamental fairness, and judicial economy require that any reasonable doubt regarding the submission of a statutory or requested mitigating factor be resolved in favor of the defendant." *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 822 (1985).

The record in the present case shows that the jury knew about the defendant's history of prior criminal activity. However, the jury was not allowed to consider whether that history was insignificant because the statutory mitigating circumstance was not submitted. Here, as in *Wilson*, "[we] cannot state that had this mitigating circumstance been submitted to the jury, the jury would not have found its existence." *See Wilson*, 322 N.C. at 146, 367 S.E.2d at 606. Furthermore, we cannot state positively that had this statutory mitigating circumstance been found and balanced against the aggravating circumstances, the jury would still have returned a sentence of death. Therefore, we are unable to hold that the failure to submit this mitigating circumstance was harmless beyond a reasonable doubt.

For the reasons discussed in this opinion, we find no error in the defendant's trial for first-degree murder. However, we vacate the sentence of death and remand this case to the Superior Court, Alamance County, for a new capital sentencing proceeding.

No error in the trial; death sentence vacated and case remanded for new capital sentencing proceeding.