STATE OF NORTH CAROLINA v. HENRY LEE McCOLLUM

No. 2A92

(Filed 30 July 1993)

1. **Criminal Law § 1338 (NCI4th) — capital sentencing proceeding — aggravating circumstance — murder to avoid arrest — adoption of another's stated motive**

    The trial court properly submitted to the jury in a capital sentencing proceeding the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest where the evidence tended to show that after defendant and three companions had raped the eleven-year-old victim, one of the companions said that they had "to kill her to keep her from telling the cops on us"; in response to this statement, the defendant and a companion held the child's arms while another companion forced her panties down her throat with a stick until she was dead; and defendant's actions following the companion's statement were thus evidence of his adoption of the companion's stated motive for killing the victim and constituted substantial competent evidence from which the jury could find that the defendant participated in the killing to avoid detection and apprehension for the felony of rape.

    **Am Jur 2d, Criminal Law §§ 598, 599.**

2. **Criminal Law § 1338 (NCI4th) — capital sentencing proceeding — aggravating circumstance — murder to avoid arrest — failure to convict on premeditation and deliberation theory**

    There was no merit to defendant's contention that since the jury failed to convict him of first-degree murder under a theory of premeditation and deliberation, the jury could not reasonably find that he acted intentionally and with premeditation during the sentencing phase and thus could not

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

find the aggravating circumstance that he participated in the killing to avoid arrest where, contrary to the trial court's instructions and the requirements of the verdict sheet itself, the jury failed to give a "yes" or "no" answer with regard to whether it found the defendant guilty on the basis of premeditation and deliberation but stated only that it had found defendant guilty under the felony-murder rule; premeditation and deliberation are only theories by which one may be convicted of first-degree murder, and defendant was not convicted or acquitted of a theory; and a conclusion that the jury rejected the theory that defendant acted with premeditation and deliberation would amount to sheer speculation unsubstantiated by anything in the record.

**Am Jur 2d, Criminal Law §§ 598, 599.**

3. **Criminal Law § 1343 (NCI4th) — capital trial — especially heinous, atrocious or cruel aggravating circumstance — instruction on "this murder"**

The trial court did not err by instructing the jury in a capital sentencing proceeding that it could find the especially heinous, atrocious or cruel aggravating circumstance if "this murder" was especially heinous, atrocious or cruel rather than requiring the jury to find that this aggravating circumstance was supported by the defendant's own conduct where all of the evidence at trial tended to show that defendant was physically present when the killing of the eleven-year-old victim took place and was an active participant in the murder, and defendant's statement to officers shows that he raped the victim and then held her arms so that another male could carry out the expressly stated intention to kill the child by forcing her panties down her throat with a stick.

**Am Jur 2d, Criminal Law §§ 598, 599.**

4. **Criminal Law § 1318 (NCI4th) — capital sentencing proceeding — instructions — when death penalty appropriate**

The trial court did not err in a capital sentencing proceeding by instructing the jury that the imposition of the death penalty would be proper if the State proved beyond a reasonable doubt, *inter alia*, that "the defendant himself killed the victim, or intended to kill the victim, or was a major

participant in the underlying felony and exhibited reckless indifference to human life."

**Am Jur 2d, Trial §§ 1077, 1142.**

5. **Criminal Law § 454 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — imagining victim as own child — no due process violation**

Assuming *arguendo* that it was improper for the prosecutor to repeatedly ask the jurors during his closing argument in a capital sentencing proceeding to imagine the eleven-year-old victim as their own child, these portions of the prosecutor's argument did not deny defendant due process where the arguments did not manipulate or misstate the evidence and did not implicate other specific rights of the accused such as the right to counsel or the right to remain silent; the trial court instructed the jurors that their decision was to be made on the basis of the evidence alone and that the arguments of counsel were not evidence; defendant's own statement to police officers established that the murder was committed for the purpose of avoiding lawful arrest and that the murder was especially heinous, atrocious or cruel; and all of these factors reduced the likelihood that the jury's decision was influenced by these portions of the prosecutor's closing argument.

**Am Jur 2d, Criminal Law § 825; Trial §§ 192, 228, 490.**

6. **Criminal Law § 447 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — impact of death on victim's father**

The prosecutor's remarks during his closing argument in a capital sentencing proceeding regarding the impact of the child victim's death on her father and the fact that he wanted revenge were not so grossly improper as to require the trial court to intervene *ex mero motu.*

**Am Jur 2d, Trial § 280.**

7. **Criminal Law § 454 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — imposition of punishment — no misstatement of law**

The prosecutor's closing argument in a capital sentencing proceeding that "you aren't the ones that are imposing the punishment yourself. It's your recommendation that's binding on the court . . ." did not misstate the law and did not tend

to diminish the jury's responsibility since the prosecutor informed the jury that its recommendation would be binding on the trial court and did not suggest that the jurors could depend upon judicial or executive review to correct any errors in their verdict.

**Am Jur 2d, Trial §§ 490, 533.**

8. **Criminal Law § 442 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — jury as conscience of community**

   The prosecutor's jury argument during a capital sentencing proceeding that "if you let this man have his life, you will be doing yourself, your community a disservice" was not improper. Furthermore, any possible error was cured when the trial court immediately sustained the defendant's objection to the prosecutor's statement.

**Am Jur 2d, Trial §§ 490, 554, 555.**

9. **Criminal Law § 452 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — weighing aggravating and mitigating circumstances — divide and conquer approach**

   The prosecutor's argument to the jury during a capital sentencing proceeding that it should weigh each individual mitigating circumstance against all of the aggravating circumstances in a "divide and conquer" approach was not so grossly improper as to require the trial court to intervene *ex mero motu.*

**Am Jur 2d, Trial §§ 490, 554, 555.**

10. **Criminal Law § 441 (NCI4th) — capital sentencing proceeding — prosecutor's jury argument — attempt to discredit expert witness**

   Where defendant's expert psychologist testified during a capital sentencing proceeding regarding the dates of her meetings with defendant and the length of his imprisonment, and both parties acknowledged that the murder occurred eight years earlier, the prosecutor's jury argument asking the jury to consider why the expert had waited seven years to examine the defendant was a permissible challenge to the accuracy of the psychologist's conclusions in light of the passage of time between the crime and her first examination of defendant

and was not an improper attempt to alert the jury to the fact that defendant had been tried on a previous occasion.

**Am Jur 2d, Trial §§ 554, 555.**

**11. Criminal Law § 452 (NCI4th) — capital sentencing proceeding — arguments for death penalty — no improper statements of personal opinion**

The prosecutor's jury arguments during a capital sentencing proceeding that "if the aggravating circumstances don't outweigh the mitigating circumstances that you may find, then there will never be a case where they do" and that "I won't have the opportunity to again get in front of you and try to convince you that this is probably the most cruel, atrocious and heinous crime you'll ever come in contact with" were not improper statements of the prosecutor's personal opinions but were proper arguments that the jury should conclude from the evidence before it that the imposition of the death penalty was proper in this case.

**Am Jur 2d, Trial §§ 497, 499.**

**12. Evidence and Witnesses § 1695 (NCI4th) — photographs of victim's body — admission for illustrative purposes**

A photograph showing a homicide victim's neck and throat during the autopsy was properly admitted to illustrate the medical examiner's testimony that the cause of death was asphyxiation and to illustrate an SBI agent's testimony explaining his collection and retrieval of the physical evidence, specifically a pair of panties from the victim's windpipe. Two photographs of the victim's body at both the crime scene and at the time of the autopsy, depicting the decomposition process, were properly admitted for illustrative purposes where an SBI agent utilized the crime scene photograph to illustrate his testimony concerning the body's appearance when it was found, and the medical examiner utilized the autopsy photograph to illustrate her testimony concerning the autopsy, the length of time the body lay in a field, and the reason for her failure to detect any sperm in the victim's body even though she had been raped.

**Am Jur 2d, Homicide §§ 417-419.**

13. **Criminal Law § 681 (NCI4th)— capital sentencing proceeding— impaired capacity mitigating circumstance—peremptory instruction—failure of jury to find**

The failure of the jury in a capital sentencing proceeding to find the impaired capacity mitigating circumstance did not violate defendant's Eighth and Fourteenth Amendment rights even though the trial court gave a peremptory instruction on this circumstance where defendant relied on the uncontradicted testimony of a psychologist to support submission of this circumstance; the psychologist's testimony was not manifestly credible in light of the fact that she did not examine defendant until seven years after the killing; and the peremptory instruction did not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility.

**Am Jur 2d, Criminal Law § 628.**

14. **Constitutional Law § 327 (NCI4th)— delay between grant of retrial and retrial—not unreasonable or unjust—absence of prejudice**

Defendant was not denied his Sixth Amendment right to a speedy trial by the delay between a 3 February 1988 Supreme Court decision awarding defendant a new trial for first degree murder and the 8 October 1990 date initially selected by the State for his retrial where defendant made no attempt to assert his right to a speedy trial during the 32-month delay between the Supreme Court decision and his written motion to dismiss for failure to afford him a speedy trial; subsequent postponements of the trial until 4 November 1991 were at the request of defendant or with his consent; the delays in retrying defendant were occasioned in substantial part by numerous motions of defendant which were still pending; a pending motion for change of venue was subsequently decided in defendant's favor and venue was moved to another county; a pending motion to dismiss due to racial prejudice in the selection of the grand jury which originally indicted defendant was apparently deemed by the State to have some merit since the State later obtained a superseding indictment returned by a different grand jury; and there was no merit to defendant's contention that he was prejudiced by the delay because he was not allowed to impeach a State's witness who had died before the retrial and whose testimony at the first trial

was admitted at the retrial where the trial court admitted into evidence the deceased witness's record of criminal convictions amassed since the first trial, a district court judge testified that he had represented the witness as an attorney and in his opinion the witness "was not a truthful person," defendant had full opportunity and motive to cross-examine the witness at the first trial, and defendant impeached the witness as effectively as if he had survived to testify.

**Am Jur 2d, Criminal Law §§ 652, 654.**

15. **Constitutional Law § 343 (NCI4th)— capital sentencing proceeding—depositions taken outside defendant's presence— introduction by defendant—harmless error**

Any violation of defendant's right under N.C. Const. art. I, § 23 to be present at every stage of his capital trial by the admission into evidence of videotaped depositions taken outside defendant's presence was harmless where defendant introduced the depositions in support of mitigating circumstances during the capital sentencing proceeding; all of the deposition testimony tended to support mitigating circumstances; and the admission of the depositions was thus favorable to defendant.

**Am Jur 2d, Criminal Law §§ 696, 697, 910.**

16. **Jury § 150 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause without rehabilitation by defendant**

The trial court did not abuse its discretion in a capital trial by excusing for cause two prospective jurors who had expressed unequivocal opposition to the death penalty without allowing defendant to propound further questions in an attempt to rehabilitate them where defendant made no showing that further questioning by him would likely have produced different answers to the questions propounded to the prospective jurors.

**Am Jur 2d, Jury §§ 195, 196.**

17. **Jury § 248 (NCI4th)— peremptory challenges—Batson violation—new panel of jurors—refusal to seat excused jurors— harmless error**

When the trial court determines that the State improperly exercised peremptory challenges to remove prospective jurors

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, the better practice is for the court to begin the jury selection anew with a new panel of prospective jurors who cannot have been affected by any prior *Batson* violation rather than to seat the jurors who were improperly excused. Assuming *arguendo* that the trial court erred in failing to reinstate three improperly removed jurors and seat them on the jury in defendant's case, such error was harmless beyond a reasonable · doubt and not prejudicial to this defendant where the trial court's order that the jury selection process begin again with a new panel provided defendant with exactly the same remedy which defendant now contends he should receive—trial by a jury selected on a nondiscriminatory basis.

**Am Jur 2d, Jury §§ 233, 235.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

18. **Evidence and Witnesses § 1341 (NCI4th) — confession — mental capacity to waive rights — sufficiency of evidence and findings**
    The trial court did not err by failing to exclude · from evidence defendant's statements to police officers on the ground that defendant's mental retardation and emotional disabilities prohibited him from knowingly and intelligently waiving his constitutional rights where the trial court found from substantial evidence introduced during a *voir dire* hearing that the officers told defendant that he could accompany them to the police station if he wished to do so; defendant chose to go with them and appeared to have no problems understanding what the officers talked about or any instructions given by the officers; the officers read each of defendant's constitutional rights to him, and he indicated that he understood them and then signed a waiver of rights form; and during the interview, all of defendant's answers were reasonable in relation to the questions asked by the officers. These findings supported the trial court's conclusion that defendant knowingly and intelligently waived his constitutional rights and voluntarily made his statements to the officers.

**Am Jur 2d, Evidence § 585.**

19. **Constitutional Law § 349 (NCI4th)— deceased witness— testimony at former trial—impeachment evidence at new trial—no violation of right to confrontation**

     Assuming *arguendo* that the trial court erred by failing to exclude in defendant's retrial testimony given at defendant's first trial by a witness who died before the retrial, this error was harmless and defendant's Sixth Amendment right to confront this witness was not denied where defendant tendered and the trial court admitted into evidence at the retrial the deceased witness's record of convictions amassed since the first trial; a district court judge testified during the retrial that, as an attorney, he had represented the witness and that in his opinion the witness was not a truthful person; defendant has not pointed to any additional information not available to him in the first trial which would have tended to impeach the witness or otherwise would have been of assistance to defendant had the witness been present during the new trial; defendant had ample opportunity to cross-examine the witness during the first trial; and defendant thus impeached the witness as effectively as if he had survived to testify and be cross-examined at the retrial.

     **Am Jur 2d, Criminal Law §§ 956-959.**

20. **Criminal Law § 1373 (NCI4th)— first-degree murder— underlying felony of rape—death penalty not excessive or disproportionate**

     A sentence of death imposed on defendant for first-degree murder was not excessive or disproportionate considering the crime and the defendant where the jury found defendant guilty of felony murder premised upon the felony of first-degree rape; the jury found as aggravating circumstances that the murder was committed for the purpose of avoiding arrest and that it was especially heinous, atrocious, or cruel; and all the evidence tended to show: defendant and three other males "gang" raped and sodomized the eleven-year-old victim while she begged them not to and called out for her "Mommy"; the defendant then helped to hold the victim's arms while one of the other men took a stick, with the victim's panties attached to the end of it, and shoved it down her throat until she stopped breathing; and the men then dragged the victim's body away from the crime scene and hid it in a field.

     **Am Jur 2d, Criminal Law §§ 627, 628.**

Chief Justice EXUM concurring in part and dissenting in part.

Justice FRYE joins in this concurring and dissenting opinion.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment and sentence of death upon the defendant's conviction of first-degree murder, entered by Thompson, J., in the Superior Court, Cumberland County, on 22 November 1991. Heard in the Supreme Court on 15 February 1993.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Robert H. Tiller for the defendant-appellant.*

MITCHELL, Justice.

The defendant was indicted by the Robeson County Grand Jury for the first-degree murder and the first-degree rape of Sabrina Buie and was tried during the 8 October 1984 Criminal Session of Superior Court, Robeson County. The jury returned verdicts finding him guilty of first-degree murder on both the theory of premeditation and deliberation and the theory of felony murder and of first-degree rape. At the conclusion of a separate capital sentencing proceeding, the jury recommended a sentence of death, and the trial court entered a sentence in accord with the recommendation. The trial court also entered judgment sentencing the defendant to imprisonment for life for first-degree rape. In an opinion filed on 3 February 1988, this Court granted the defendant a new trial for errors committed in the trial court and remanded this case to the Superior Court, Robeson County. *State v. McCollum*, 321 N.C. 557, 364 S.E.2d 112 (1988).

After our remand, the defendant was indicted by the Robeson County Grand Jury in a superseding indictment for the first-degree murder of Sabrina Buie. Following an order changing venue to Cumberland County, the defendant was tried capitally at the 4 November 1991 Criminal Session of Superior Court, Cumberland County. The jury convicted the defendant of first-degree rape and of first-degree murder on the felony murder theory. At a separate capital sentencing proceeding, pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court entered a sentence of

death upon the verdict finding the defendant guilty of first-degree murder. The trial court arrested judgment on the conviction of first-degree rape. The defendant appealed to this Court as a matter of right from the judgment sentencing him to death for first-degree murder.

The State's evidence introduced at trial tended to show, *inter alia*, the following. On Sunday, 25 September 1983 at approximately 12:20 a.m., Ronnie Lee Buie noticed that his eleven-year-old daughter, Sabrina Buie, was missing from their home in Robeson County when he returned home from working the midnight shift at a nearby business. On 26 September 1983, James Shaw, a friend of Ronnie Lee Buie, found Sabrina Buie's nude body in a soybean field.

An autopsy was performed upon the body of Sabrina Buie. Linear abrasions on her back and buttocks revealed a pattern indicating that the body had been dragged over a rough surface. There was a tear or laceration deep within the victim's vagina and a tear or laceration in her anal canal. Petechial hemorrhaging, characterized as the bursting of small blood vessels caused by pressure, was observed in the victim's eyes. Similar hemorrhaging caused by a pressure mechanism was also observed in the heart and lungs. The brain appeared slightly swollen due to a lack of oxygen.

A stick and pair of panties were wedged in the victim's throat, ·completely obstructing the airway. Dr. Deborah Radisch, Chief Assistant Medical Examiner for the State of North Carolina, testified that the victim died of asphyxiation.

The defendant, Henry Lee McCollum, gave a statement to law enforcement officers on 28 September 1983. In this statement, the defendant McCollum said that he saw Sabrina Buie and Darrell Suber come out of Suber's house at approximately 9:30 p.m. on 24 September 1983. McCollum, Chris Brown, Louis Moore and Leon Brown joined Sabrina Buie and Darrell Suber, and the group then went to a "little red house near the ballpark." The five males tried to convince Sabrina to have sexual intercourse with them, but she refused. Two of the males went to a store and purchased some beer. When they returned, the males discussed having sexual intercourse with Sabrina. Louis Moore refused to participate and left.

The four remaining males and Sabrina then walked across a soybean field and sat in some bushes where they drank beer.

Suber stated that he was going to have sexual intercourse with Sabrina. At this point, the defendant McCollum grabbed Sabrina's right arm and Leon Brown grabbed her left arm. Eleven-year-old Sabrina then began to yell, "Mommy, Mommy" and "Please don't do it. Stop." Suber then raped Sabrina while the defendant and Brown held her arms. Subsequently, each man raped Sabrina while the others held her. Leon Brown then sodomized the child while Chris Brown held her.

After the men had raped and sodomized Sabrina, Suber said "we got to do something because she'll go uptown and tell the cops we raped her. We got to kill her to keep her from telling the cops on us." The defendant McCollum grabbed Sabrina's right arm while Leon Brown grabbed her left arm. Chris Brown knelt over Sabrina's head and pushed her panties down her throat with a stick while Leon Brown and the defendant held her down. After determining that the child was dead, the defendant and Chris Brown dragged her body away to a bean field to hide it from view.

Other evidence introduced at trial is discussed at other points in this opinion where pertinent to the issues raised by the defendant.

[1] By his first assignment of error, the defendant contends that the trial court erred in the capital sentencing proceeding by submitting to the jury the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The defendant argues that since the jury declined to convict him under a theory of premeditation and deliberation, the jury could not subsequently find that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The defendant also argues that since the only person expressing the intent to avoid arrest as a basis for the murder was Darrell Suber, not the defendant, there is no evidence that the defendant acted in an attempt to avoid a lawful arrest.

N.C.G.S. § 15A-2000(e)(4) provides that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the "capital felony was committed for the purpose of avoiding or preventing a lawful arrest. . . ." N.C.G.S. § 15A-2000(e)(4) (1988). However, before the trial court may instruct the jury on this aggravating circumstance, there must be substantial competent evidence from which the jury can infer that at least

one of the defendant's purposes for the killing was the defendant's desire to avoid subsequent detection and apprehension for his crime. *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979).

In the present case, evidence tended to show that after the defendant and the other males had raped Sabrina Buie, Darrell Suber said, "we got to kill her to keep her from telling the cops on us." In response to Suber's statement, the defendant and Leon Brown held the child's arms while Chris Brown forced her panties down her throat with a stick until she was dead. The defendant's actions following Suber's statement were evidence of his adoption of Suber's stated motive for killing Sabrina Buie. Therefore, evidence of the defendant's actions following Suber's statement was substantial competent evidence from which the jury could find that the defendant participated in the killing to avoid detection and apprehension for the felony of rape.

[2] The defendant also argues in support of this assignment of error that the jury "declined to convict him of murder with malice, premeditation and deliberation" and, in so doing, rejected the theory that he participated in the killing of the victim after premeditation and deliberation. The defendant contends that: "In so doing, the jury rejected the argument that Mr. McCollum 'intentionally killed the victim or that he intended that she be killed . . . and that he acted with malice after premeditation and deliberation.'" The defendant argues that, as a result, the jury's verdict "shows that there was not sufficient evidence to find that Mr. McCollum acted with premeditation and deliberation. *A fortiori*, there was also not sufficient evidence to find that 'one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for the crime.'" The defendant reasons that, having failed to find that the defendant "acted intentionally and with premeditation in the guilt phase, the jury could not then reasonably find that he acted intentionally and with premeditation in the sentencing phase." Therefore, the defendant argues that the trial court erred by permitting the jury to consider finding the aggravating circumstance that the defendant participated in the killing to avoid arrest. We do not agree.

The pertinent portions of the verdict form submitted to the jury in connection with the first-degree murder charge and the answers the jury recorded thereon were as follows:

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

We, the jury return the unanimous verdict as follows:

1. GUILTY of FIRST DEGREE MURDER

    Answer: <u>yes</u>

> IF YOU ANSWER "YES," IS IT:
>
> A. On the basis of malice, premeditation and deliberation?
>
> ANSWER: _____
>
> B. Under the first-degree felony murder rule?
>
> ANSWER: ___yes___

Contrary to the trial court's instructions and the requirements of the verdict sheet itself, the jury failed to give either a "yes" or "no" answer with regard to whether it found the defendant guilty of first-degree murder on the basis of premeditation and deliberation. Instead, the jury stated that it had found the defendant guilty of first-degree murder under the felony murder rule without giving any indication as to whether it had reached or decided the question of whether the defendant participated in the killing with malice and after premeditation and deliberation.

This Court has taken the position that: "Premeditation and deliberation is a theory by which one may be convicted of first degree murder; felony murder is another such theory. Criminal defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes." *State v. Thomas*, 325 N.C. 583, 593, 386 S.E.2d 555, 561 (1989) (citations omitted). Therefore, the defendant here was convicted of first-degree murder and has not been acquitted of anything. *See id.*

More to the point, we cannot know from the jury's failure to follow the trial court's instructions to give a "yes" or "no" answer to the question relating to premeditation and deliberation what, if any, consideration the jury gave to this issue or what, if any, decision it reached. To conclude, as the defendant would have us conclude, that the jury rejected the theory that the defendant acted with premeditation and deliberation would require us to engage in sheer speculation unsubstantiated by anything in the

record before us. This we may not do. Accordingly, we conclude that this assignment of error is without merit.

[3] By another assignment of error, the defendant contends that the trial court erred in the capital sentencing proceeding by submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) provides that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). The defendant does not contend that the murder of the eleven-year-old victim by the men who had just raped and sodomized her was not especially heinous, atrocious or cruel. Instead, he contends that the trial court erred by instructing the jury that it could find this aggravating factor if "this murder" was especially heinous, atrocious or cruel, because the trial court's "instruction" failed to require the jury to find this aggravating circumstance only if it was supported by the defendant's own conduct.

As authority for his argument, the defendant relies upon *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982). In *Enmund*, the Court held that capital punishment must be tailored to the particular defendant's personal responsibility and moral guilt. *Enmund*, 458 U.S. at 801, 73 L. Ed. 2d at 1154. However, the defendant's reliance on *Enmund* is misplaced. *Enmund* involved the propriety of a death sentence, based upon a felony murder conviction, imposed upon a defendant who did not commit the homicide, was not physically present when the killing took place, and did not intend that a killing take place or that lethal force be employed.

In the present case, entirely unlike the situation in *Enmund*, all of the evidence at trial tended to show that the defendant was physically present when the killing took place and was an active participant in Sabrina Buie's murder. The defendant's statement to law enforcement officers shows that he raped Sabrina Buie and then held her arms so that Chris Brown could carry out the expressly stated intent to kill the child. In light of the uncontroverted evidence of the defendant's active participation in Sabrina Buie's murder, coupled with the brutal nature of the crime, the manner in which the trial court submitted the aggravating circumstance was not error. This assignment of error is without merit.

**STATE v. McCOLLUM**

[334 N.C. 208 (1993)]

[4] By another assignment of error, the defendant contends that the trial court erred in the capital sentencing proceeding by instructing the jury that the imposition of the death penalty would be proper if the State proved beyond a reasonable doubt that the defendant "was a major participant in the underlying felony and exhibited reckless indifference to human life."

In *Enmund* the Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Enmund*, 458 U.S. at 801, 73 L. Ed. 2d at 1154. In a later case, however, the Court further construed its holding in *Enmund* and held that major participation in the felony committed, combined with reckless indifference to human life, is sufficient grounds for the imposition of the death penalty. *Tison v. Arizona*, 481 U.S. 137, 158, 95 L. Ed. 127, 145 (1987).

In the instant case, the trial court instructed the jury that before it could recommend that the defendant be sentenced to death, the State must, *inter alia*, prove beyond a reasonable doubt that "the defendant himself killed the victim, or intended to kill the victim, or was a major participant in the underlying felony and exhibited reckless indifference to human life." This instruction comports with *Enmund* and *Tison*, as well as with the North Carolina Pattern Instructions. *See* N.C.P.I.—Crim. 150.10 (1988). Accordingly, this assignment of error is without merit.

By another assignment of error, the defendant contends that the trial court erred in permitting the prosecutor to make several prejudicial statements during closing arguments in the capital sentencing proceeding. The defendant contends that the prosecutor's closing argument contained statements which tended to inflame the jury, misstate the applicable law, or had no evidentiary basis in the record.

As a general proposition, counsel is allowed wide latitude in the jury argument during the capital sentencing proceeding. *State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992). Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). In order for a defendant to receive a new sentencing proceeding, the prosecutor's comments must have

"so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986). In the present case, the defendant argues that several portions of the prosecutor's closing argument were prejudicial. We will address each of the defendant's contentions individually.

[5]   On several occasions, the prosecutor asked the jurors to imagine that the victim was their child. Specifically, the prosecutor asked the jurors the following questions: "How many of you would want your child to be drug across a wooded field, a wooded area, to have the skin scraped off her young back like that after these defendants had raped her and abused her body." "The photographs that you've seen during the course of this trial, the photographs showing Sabrina bleeding from her nose, from her mouth, how many of you would like to have to see your child looking like that?" "How many of you would want your child to end up in a morgue looking like that and have to have her body split open to determine how she died?" The trial court overruled the defendant's objections to these arguments. However, the trial court subsequently sustained the defendant's objections to substantially similar arguments.

An argument "asking the jurors to put themselves in place of the victims will not be condoned. . . ." *United States v. Picknarcek*, 427 F.2d 1290, 1291 (9th Cir. 1970). In the present case, the prosecutor repeatedly asked the jury to imagine the victim as their own child. We assume *arguendo* that these arguments were improper. At issue in this case, therefore, is whether these portions of the prosecutor's closing argument denied the defendant due process. *See Darden v. Wainwright*, 477 U.S. 168, 91 L. Ed. 2d 144 (1986).

The prosecutor's arguments here did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent. The trial court instructed the jurors that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. Moreover, the weight of the evidence against the defendant with respect to the two aggravating circumstances submitted to the jury was heavy; the defendant's own statement to police officers established that the murder was committed for the purpose of avoiding lawful arrest and that the murder was especially heinous, atrocious or cruel. All of these factors re-

duced the likelihood that the jury's decision was influenced by these portions of the prosecutor's closing argument. Therefore, the prosecutor's closing argument did not deny the defendant due process. *Id.*

[6] The defendant next argues that the trial court should have excluded the prosecutor's comments regarding the impact of Sabrina's death on her father and the fact that he wanted revenge. The defendant contends that these statements sought to inflame the jury. However, there were no objections made to these portions of the prosecutor's argument during the capital sentencing proceeding. If a party fails to object to a closing argument, we must decide whether the argument was so improper as to warrant the trial judge's intervention *ex mero motu. State v. Craig,* 308 N.C. 446, 457, 302 S.E.2d 740, 747, *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983). The standard of review is one of "gross impropriety." *Id.* In *State v. King,* 299 N.C. 707, 264 S.E.2d 40 (1980), this Court held that the prosecutor's remarks during closing concerning what the victim must have been thinking as he was dying and what the family of the victim experienced following the loss were not grossly improper. Similarly, we conclude that the prosecutor's remarks regarding the impact of Sabrina's death on her father and the fact that he wanted revenge were not so grossly improper as to require the trial court to intervene *ex mero motu.*

[7] The defendant next argues in support of this assignment that the prosecutor made several misstatements of law during closing arguments in the capital sentencing proceeding. It is well settled that the trial court is required to censor remarks not warranted either by the law or by the facts. *State v. Britt,* 291 N.C. 528, 231 S.E.2d 644 (1977). First, the defendant argues that the prosecutor's comments tended to diminish the jury's responsibility during the sentencing phase of this capital case in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 86 L. Ed. 2d 231 (1985). In *Caldwell* the Court held that it is unconstitutional to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Id.* at 328, 86 L. Ed. 2d at 239. In the present case, the prosecutor told the jury that "you aren't the ones that are imposing the punishment yourself. It's your recommendation that's binding on the Court, but it is a fair recommendation if you recommend the death penalty in this case." The prosecutor's statement that the jury's recommendation is binding

on the Court is consistent with N.C.G.S. § 15A-2000(b), which provides that "[a]fter hearing the evidence, argument of counsel, and instructions of the court, the jury shall deliberate and render a sentence recommendation to the court. . . ." N.C.G.S. § 15A-2000(b) (1988). Moreover, the prosecutor's statement informed the jury that its recommendation would be binding on the trial court and did not suggest to the jurors that they could depend upon judicial or executive review to correct any errors in their verdict. The prosecutor did not misstate the law in this portion of the closing argument.

[8]  The defendant next argues that the prosecutor improperly suggested to the jury during the capital sentencing proceeding that its decision should be made with reference, not just to the evidence, but also to the desires of their community. The prosecutor stated, "and if you let this man have his life, you will be doing yourself, your community a disservice." It is well settled that the prosecutor's remarks reminding the jury that, for purposes of the defendant's trial, it was acting as the voice and conscience of the community are permissible. *Soyars*, 332 N.C. at 61, 418 S.E.2d at 488; *State v. Scott*, 314 N.C. 309, 333 S.E.2d 296 (1985). In addition, the trial court in this case immediately sustained the defendant's objection to the prosecutor's statement. Therefore, any possible error was cured.

[9]  The defendant next argues that the prosecutor improperly argued to the jury during the capital sentencing proceeding that it should weigh each individual mitigating circumstance against all of the aggravating circumstances in a "divide and conquer" approach. For example, in arguing that the jury should give little weight to the defendant's mental disabilities, the prosecutor stated that "the aggravating circumstances substantially outweigh that factor." The defendant did not object to the prosecutor's statements. Therefore, we must determine whether the trial court was required to intervene *ex mero motu. See State v. Craig*, 308 N.C. 446, 457 S.E.2d 740 (1983). We conclude that there was no such gross impropriety here.

[10]  The defendant next argues that during the capital sentencing proceeding the prosecutor improperly attempted to alert the jury to the fact that the defendant had been tried on a previous occasion. In an attempt to discredit Dr. Faye Sultan, the defendant's expert psychologist, the prosecutor asked the jury to consider why the

expert had waited seven years to examine the defendant. The defendant notes that the prosecutor did not ask this question during cross examination.

Counsel is permitted to argue from the evidence which has been presented, as well as reasonable inferences that can be drawn therefrom. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. Dr. Sultan testified regarding the dates of her meetings with the defendant and the length of his imprisonment. In addition, both parties had acknowledged that the murder occurred in September 1983. Consequently, it was permissible for the prosecutor to challenge the accuracy of Dr. Sultan's conclusions in light of the passage of seven years between the commission of the crime and her first examination of the defendant.

[11] The defendant next contends that the prosecutor improperly expressed his personal opinions during closing arguments in the sentencing proceeding. The defendant argues that the following statements were improper: First, the prosecutor stated, "if the aggravating circumstances don't outweigh the mitigating circumstances that you may find, then there will never be a case where they do." Second, the prosecutor stated, "I won't have the opportunity to again get in front of you and try to convince you that this is probably the most cruel, atrocious and heinous crime you'll ever come in contact with." The defendant did not object at trial to these statements. Therefore, the gross impropriety standard applies. The prosecutor's comments in this case were proper in light of his role as a zealous advocate for convictions in criminal cases. *See Scott*, 314 N.C. at 311, 333 S.E.2d at 297. The prosecutor was not stating his personal opinion, but merely arguing that the jury should conclude from the evidence before it that the imposition of the death penalty was proper in this case. For the foregoing reasons, we conclude that the arguments of the prosecutor during the capital sentencing proceeding in this case, which are the subject of this assignment of error, did not amount to prejudicial error. Accordingly, this assignment of error is overruled.

[12] By another assignment of error, the defendant contends that the trial court erred by admitting photographs of the victim's body into evidence. For the limited purpose of illustrating the testimony of the medical examiner and Agent Leroy Allen, the trial court admitted three photographs of the victim's body into evidence. The defendant contends that admission of these photographs was

error because their probative value was substantially outweighed by their unfair tendency to inflame the jury. N.C.G.S. § 8C-1, Rule 403 (1988).

Photographs of a homicide victim's body may be introduced into evidence to explain or illustrate testimony. *State v. Watson,* 310 N.C. 384, 312 S.E.2d 448 (1984). Moreover, photographs may be introduced into evidence even if they are gruesome, so long as they are used by a witness to illustrate his testimony and an excessive number are not used solely to arouse the passions of the jury. *State v. Murphy,* 321 N.C. 738, 365 S.E.2d 615 (1988).

In the present case, the medical examiner, Dr. Deborah Radisch, utilized a photograph showing the victim's neck and throat during the autopsy to illustrate her testimony concerning the cause of death. A stick and a pair of panties had been found lodged in the victim's throat and Dr. Radisch determined that the cause of death was asphyxiation. State Bureau of Investigation Agent Leroy Allen utilized the photograph to illustrate and explain his collection and retrieval of the physical evidence, specifically the panties from the victim's windpipe. This photograph was properly admitted for the limited purpose of illustrating the witness's testimony.

The defendant also contends that photographs of the victim's face, at both the crime scene and at the time of the autopsy, depicting the decomposition process, were introduced for the sole purpose of inflaming the jury. On the contrary, Agent Allen utilized the crime scene photograph to illustrate his testimony concerning the body's appearance when it was found at the crime scene. Similarly, Dr. Radisch utilized the photograph taken at the autopsy to illustrate her testimony regarding the autopsy. Specifically, the presence of decomposition bears directly upon the length of time the body lay in the field and further explained Dr. Radisch's testimony concerning her failure to detect any sperm in the victim's body. Since the photographs were not excessive in number and were used for the purpose of illustrating the testimony of Dr. Radisch and Agent Allen, the trial court did not err in admitting the photographs into evidence. This assignment is without merit.

[13] By another assignment of error, the defendant contends that the jury's failure to find clearly proven mitigating circumstances violated his rights under the Eighth and Fourteenth Amendments. The trial court instructed the jury that

All of the evidence tends to show that the capacity of the defendant to appreciate the criminality of his conduct or to conform to the requirements of law was impaired.

Therefore, as to this circumstance, I charge you that if one or more of you find the facts to be as all the evidence tends to show, you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form.

However, if none of you find this circumstance to exist even though there is no evidence to the contrary, then you would so indicate by having your foreman write "no" in that space.

Despite the trial court's peremptory instruction, the jury failed to find the mitigating circumstance.

It is well settled that a peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility. *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). In the present case, the defendant relied upon the testimony of Dr. Faye Sultan to support the submission of the mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time the victim was killed. Contrary to the defendant's contention, the jury was not required to accept Dr. Sultan's testimony. *See id.* Even though Dr. Sultan's testimony was uncontradicted, we cannot say, in light of the fact that she did not examine the defendant until seven years after the killing, that her testimony was manifestly credible. Accordingly, this assignment of error is without merit.

[14] By another assignment of error, the defendant contends that his Sixth Amendment right to a speedy trial was violated. The defendant was originally tried during the 8 October 1984 Criminal Session of Superior Court for Robeson County and sentenced to death on 25 October 1984. In an opinion filed on 3 February 1988, this Court granted the defendant a new trial and remanded this case to the Superior Court, Robeson County. *State v. McCollum*, 321 N.C. 557, 364 S.E.2d 112 (1988). A superseding indictment for murder was returned against the defendant by the Robeson County Grand Jury on 7 January 1991. Thereafter, venue for trial was transferred from Robeson County to Cumberland County.

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

Although the record on appeal is less than complete, the defendant's motion for speedy trial included in the Record on Appeal in this case contains a statement by counsel for the defendant that he was informed in August of 1990 that the State intended to bring this case to trial (apparently in Robeson County) during the week of 8 October 1990. Subsequently, counsel for the defendant informally requested that the trial date be set later in October or in November. The motion for speedy trial asserts that as a result of a later conference telephone call between the court and counsel for the defendant and for the State, counsel for the defendant suggested a 26 November 1990 trial date "as an accommodation for the defendant," which "was agreed to by the Court and counsel for the state." The record on appeal is silent as to when, why or how the trial date was moved to the time the case was actually tried in November of 1991. However, it is clear that the case was tried at that time upon the superseding indictment for murder returned by the grand jury in January of 1991.

The Record on Appeal includes an order entered in the Superior Court, Robeson County, on 31 July 1991 which states that as of the date of that order "the defendant's motions to dismiss because of racial discrimination in the Grand Jury make-up and for change of venue are presently pending motions for which the court has not ruled upon, along with other pending motions." The order of 31 July 1991 also recites that "the defendant's trial was scheduled to begin on November 26, 1990, 1,027 days from the decision rendered on the defendant's appeal, but the case has been postponed further by motion and consent of defendant through his attorneys." The Superior Court went on to conclude in the 31 July 1991 order:

> That even though the delay of defendant's trial has been a long delay, it has not been an inordinate delay based on the seriousness of the charges and the complexities of the issues to be resolved concerning motions and rulings on those motions and other rulings of law.

> That there has been reasonable justification for failure to bring the defendant to trial sooner in that the former prosecutor of the case, The Honorable Joe Freeman Britt, is now a North Carolina Superior Court Judge and a new prosecutor, Assistant District Attorney John Carter, has been assigned to prosecute the charges against the defendant.

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

That there appears to have been no prejudice to the defendant, Henry Lee McCollum, because of the delay of the trial.

Based upon its conclusions, the Superior Court denied the defendant's motion that the case against him be dismissed for failure to afford him a speedy trial.

From the record before us, it appears, although it is by no means certain, that the trial of this case was first scheduled for retrial during the week of 8 October 1990. The record indicates that any continuances of the date for trial to dates after that time were at the request of or with the acquiescence and consent of the defendant.

The Sixth Amendment to the Constitution of the United States provides, in pertinent part, that "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. In determining whether a delay in a trial violates the Sixth Amendment, this Court must examine the following interrelated factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101 (1972).

From the Record on Appeal in the present case, it appears that the defendant made no attempt to assert his right to a speedy trial during the 32-month interval between 3 February 1988, the date on which this Court entered its decision granting him a new trial, and September 1990, when the defendant filed his written motion to dismiss for failure to afford him a speedy trial. Delays in trying the case thereafter were at the request of the defendant or with his consent. The delay between our decision awarding the defendant a new trial and the initial date selected by the State for the defendant's retrial in this case was substantial. However, given the reasons for the delay found to have existed by the trial court, we conclude that the delay was not unreasonable or unjust and did not deny the defendant the right to a speedy trial guaranteed by the Sixth Amendment.

The order of the trial court denying the defendant's motion to dismiss for lack of a speedy trial makes it clear that the delays in retrying the defendant were occasioned in substantial part by reason of numerous motions *of the defendant* which were still

pending. One of these motions, the motion for change of venue, was subsequently decided in the defendant's favor and venue was moved to Cumberland County. In addition, the motion to dismiss the action due to racial prejudice in the selection of the Grand Jury which initially indicted the defendant was apparently deemed by the State to have some merit since the State later obtained a superseding indictment returned by a different Grand Jury. Therefore, we do not believe that either the length of delay or the reasons for the delay argue strongly in favor of a conclusion that the defendant was denied his right to a speedy trial as guaranteed by the Sixth Amendment.

With respect to prejudice resulting from the delay, the defendant contends that he has been prejudiced because he was not allowed to impeach one of the State's witnesses, L.P. Sinclair. Sinclair, who had died before the defendant's retrial, had given testimony during the defendant's first trial to the effect that Sinclair had overheard the defendant and others planning to rape Sabrina and that the defendant later described the murder of the child to Sinclair. The trial court allowed the prosecution to introduce portions of Sinclair's former testimony. We conclude, however, that the defendant did not suffer any prejudice because the trial court admitted into evidence Sinclair's record of criminal convictions amassed since the defendant's first trial. Further, District Court Judge Stanley Carmical testified during the new trial of this case that, as an attorney, he had represented Sinclair in April 1989 and that in his opinion Sinclair "was not a truthful person." Further, the defendant had full opportunity and motive to cross-examine Sinclair at the first trial. The defendant impeached Sinclair as effectively as if Sinclair had survived to testify. We conclude that the defendant has not suffered any prejudice by reason of pretrial delay. This assignment of error is without merit.

[15] By another assignment of error, the defendant contends that his right under the Constitution of North Carolina to be present at all stages of his capital trial was violated by the admission into evidence of video-taped depositions taken outside his presence. In these depositions, counsel for both sides questioned the defendant's relatives and former teachers regarding his upbringing and character. These depositions were taken in New Jersey while the defendant was imprisoned in North Carolina.

The Confrontation Clause of the Constitution of North Carolina, article I, section 23, guarantees the defendant's presence at every stage of his capital trial. *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). In the present case, the *defendant* introduced the depositions in support of mitigating circumstances during the capital sentencing proceeding. Nevertheless, the defendant now contends that the admission of the depositions which were taken without his presence violated his right to be present at every stage of his capital trial. This Court has previously held that the "induced error" or "invited error" doctrine, now codified as N.C.G.S. § 15A-1443(c), does not apply to the non-waivable right of a defendant to be present at every stage of his capital trial as guaranteed by the Constitution of North Carolina. *Huff*, 325 N.C. at 34, 381 S.E.2d at 654. Therefore, we turn to the issue of whether any error in the admission of the depositions in question was harmless error. In determining whether a violation of the state constitutional requirement that the defendant be present at every stage of his capital trial was harmless, we must determine whether the State has borne the burden of showing that the error was harmless beyond a reasonable doubt. *Id.* at 34-35, 381 S.E.2d at 654.

For purposes of our consideration of the defendant's argument that his right under the Constitution of North Carolina to be present at every stage of his capital trial was violated, we assume *arguendo* that the taking of the depositions in New Jersey in the absence of the defendant amounted to a "stage" of his capital trial. However, it is clear that all of the testimony of the witnesses during the taking of those depositions tended to support mitigating circumstances. The admission of those depositions into evidence was favorable to the defendant and in no way adverse to his interests. Therefore, we conclude that any error involved in the admission of the depositions into evidence during the capital sentencing proceeding in the present case could not possibly have harmed the defendant. Accordingly, we conclude that the State has borne its burden of showing that any error here was harmless beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

[16] By another assignment of error, the defendant contends that the trial court erred in refusing to allow him to examine and attempt to rehabilitate jurors who had been successfully challenged

for cause by the State. *See Gray v. Mississippi*, 481 U.S. 648, 95 L. Ed. 2d 622 (1987) (plurality opinion). We do not agree.

This Court has consistently held that:

> [w]hen challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged [about the same matter].

*State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990) (quoting *State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1983)). We conclude that the plurality decision in *Gray* does not invalidate this statement of the law.

Under this assignment of error, the defendant specifically complains of the trial court's action in excusing prospective jurors Barbour and Godbolt for cause. Before she was excused for cause, Barbour stated, in response to a question by the prosecutor, that she could not vote for a death sentence. After further questioning by the prosecutor and the trial court, she made it clear that, although she did not want to violate the law concerning the imposition of a death sentence, this was still her feeling. Additionally, she expressly acknowledged that her views on capital punishment would substantially impair her ability to perform her duties as a juror. Nothing in the record suggests that any further proper questioning would have altered her responses.

Prospective juror Godbolt also acknowledged strong personal feelings about the death penalty that would probably affect her impartiality. Upon questioning by the trial court, she reiterated that position. Nothing in the record suggests that further proper questioning would have caused her to alter her beliefs.

The defendant having made no showing that further questioning by him would likely have produced different answers, the trial court did not abuse its discretion by excusing the prospective jurors in question, who had expressed unequivocal opposition to the death penalty, without allowing the defendant to propound further questions in an attempt to rehabilitate them. *See id.* This assignment of error is without merit.

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

[17]  By another assignment of error, the defendant contends that the trial court erred in refusing to seat jurors who previously had been excused as a result of improper peremptory challenges by the State. During jury selection, the State exercised three consecutive peremptory challenges to remove black prospective jurors. The defendant objected on the ground that the prosecutor's peremptory challenges established a prima facie case of racial discrimination in the jury selection in violation of principles discussed in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). The trial court agreed. The prosecutor attempted to articulate a non-discriminatory basis for his peremptory challenges, but the trial court was unpersuaded and concluded that a *Batson* violation had occurred. The trial court then inquired as to how the defendant and the State desired to proceed to correct the *Batson* violation. At this point, the defendant requested that the three black jurors the State had removed by peremptory challenges be seated. However, the trial court declined to seat these jurors and ordered that the jury selection process begin again with a new panel of forty prospective jurors.

In *Batson* the Supreme Court of the United States held that the Equal Protection Clause forbids a prosecutor to peremptorily challenge potential jurors on account of their race. *Id.* at 96, 90 L. Ed. 2d at 88. However, the *Batson* court stated that

> we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire.

*Id.* at 100 n. 24, 90 L. Ed. 2d at 90 n. 24. Since its holding in *Batson*, however, the Supreme Court has held that a prospective juror has a right under the Equal Protection Clause of the Fourteenth Amendment not to be excluded from jury service on account of race. *Powers v. Ohio*, 499 U.S. ---, ---, 113 L. Ed. 2d 411, 424 (1991). Although the prospective juror's right is independent of the rights of the criminal defendant on trial, the defendant has standing to raise the equal protection claim of a prospective juror improperly excluded on the basis of race. *Id.*

We believe that the better practice is that followed by the trial court in this case, and that neither *Batson* nor *Powers* requires a different procedure. We recognize and endorse the equal protection right of prospective jurors explained in detail in *Powers*. However, we conclude that the primary focus in a criminal case—particularly a capital case such as this—must continue to be upon the goal of achieving a trial which is fair to both the defendant and the State. To ask jurors who have been improperly excluded from a jury because of their race to then return to the jury to remain unaffected by that recent discrimination, and to render an impartial verdict without prejudice toward either the State or the defendant, would be to ask them to discharge a duty which would require near superhuman effort and which would be extremely difficult for a person possessed of any sensitivity whatsoever to carry out successfully. As *Batson* violations will always occur at an early stage in the trial before any evidence has been introduced, the simpler, and we think clearly fairer, approach is to begin the jury selection anew with a new panel of prospective jurors who cannot have been affected by any prior *Batson* violation.

Assuming *arguendo* that the trial court erred in failing to reinstate the prospective jurors previously excused and seat them on the jury in the defendant's case, however, we conclude that the error was harmless beyond a reasonable doubt and, therefore, not prejudicial *to this defendant*. N.C.G.S. § 15A-1443(b) (1988). If we held that the trial court's failure to reinstate the improperly removed jurors constituted error, the only practicable remedy we could provide at this point would be a new trial with a new jury selected on a nondiscriminatory basis. In the present case, after finding that there was *Batson* error, the trial court ordered that a new jury be selected on a nondiscriminatory basis. Therefore, the trial court's order provided the defendant with exactly the same remedy which the defendant now contends he should receive—trial by a jury selected on a nondiscriminatory basis. Consequently, the defendant has not suffered any prejudice by the action of the trial court which gave him the same remedy he now seeks. This assignment of error is overruled.

[18] By another assignment of error, the defendant contends that the trial court erred in failing to exclude from evidence the defendant's statements made to police officers because they were obtained in violation of his constitutional rights. Specifically, the defendant contends that his mental retardation and emotional disabilities pro-

hibited him from making a knowing and intelligent waiver of his constitutional rights.

Based upon evidence introduced during the *voir dire* hearing on the admissibility of the defendant's statements, the trial court made findings and concluded that the defendant knowingly and intelligently waived his constitutional rights and voluntarily made the statements in question. The trial court found from substantial evidence introduced during the *voir dire* that the officers told the defendant that he could accompany them to the police station if he wished to do so. He chose to go with them and he appeared to have no problems understanding what the officers talked about or any instructions given by the officers. While at the police station, the officers read each of the defendant's constitutional rights to him, and he indicated that he understood them and then signed a waiver of rights form. During the interview, all of the defendant's answers were reasonable in relation to the questions asked by the officers.

It is well established that mental retardation is a factor to be considered in determining the voluntariness of a confession, but this condition standing alone does not render an otherwise voluntary confession inadmissible. *E.g., State v. Allen,* 322 N.C. 176, 367 S.E.2d 626 (1988); *State v. Thompson,* 287 N.C. 303, 214 S.E.2d 742 (1975). We have also repeatedly held that the trial court's findings of fact following a *voir dire* hearing concerning the admissibility of a confession are conclusive and binding on the appellate courts when, as here, they are supported by substantial competent evidence. *State v. Mahaley,* 332 N.C. 583, 423 S.E.2d 58 (1992). The conclusions of law made by the trial court from such findings, however, are fully reviewable on appeal. *Id.* Those conclusions of law will be sustained on appeal if they are correct in light of the findings. *Id.*

In the present case, the trial court's findings were amply supported by substantial evidence presented on *voir dire*. Furthermore, the trial court's conclusion that the defendant knowingly and intelligently waived his constitutional rights and voluntarily made his statements to the officers was a correct conclusion of law in light of the findings. Therefore, we conclude that the trial court did not err in this regard. This assignment of error is without merit.

[19] By another assignment of error, the defendant contends that the trial court violated his Sixth Amendment confrontation right in failing to exclude the former testimony of State's witness L.P. Sinclair. Sinclair testified during the first trial of this case, in which the defendant was convicted and sentenced to death. However, Sinclair died prior to the new trial which is the basis of the defendant's current appeal to this Court. The defendant contends that he did not have an adequate opportunity to cross-examine Sinclair during the new trial of this case because new evidence concerning Sinclair's reputation for untruthfulness had surfaced since the first trial.

Assuming *arguendo* that the trial court erred in failing to exclude Sinclair's former testimony, this error was harmless beyond a reasonable doubt. We have pointed out previously in this opinion, the defendant tendered and the trial court admitted into evidence Sinclair's record of convictions amassed since the first trial. Further, District Court Judge Stanley Carmical testified during the new trial of this case that, as an attorney, he had represented Sinclair in April 1989 and that in his opinion Sinclair "was not a truthful person." The defendant has not pointed to any additional information not available to him in the first trial of this case which would have tended to impeach Sinclair as a witness or otherwise would have been of assistance to the defendant had Sinclair been present and subject to cross-examination during the defendant's new trial. We conclude, therefore, that the defendant impeached Sinclair as effectively as if he had survived to testify and be cross-examined. Given the defendant's opportunity to cross-examine Sinclair at the time Sinclair testified during the first trial of this case, and in light of the fact that the defendant was permitted to offer the foregoing evidence in the new trial tending to impeach Sinclair's credibility, we conclude that the defendant was not denied his Sixth Amendment right to confront this witness. This assignment of error is without merit.

We have addressed the foregoing assignments of error in the order they were presented in the defendant's brief before this Court in this appeal. The defendant has also brought forward on this appeal other assignments of error which he correctly acknowledges have previously been decided by this Court contrary to his position, but which he nonetheless brings forward in order to preserve them for further appellate review. We acknowledge that those assignments are properly preserved, but as we have

previously found them to be without merit we do not address them here.

Having concluded that the defendant's trial and capital sentencing proceeding were free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. *See State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 354-55, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based, (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration, and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.*

We have thoroughly examined the record, transcripts, and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

[20] We turn now to our final statutory duty of proportionality review. In conducting proportionality review, "we determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *Id.*

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

In the present case, the defendant was convicted of first-degree murder (upon the theory of felony murder) and of first-degree rape. The jury found as an aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest. Further, the trial court having given the jury instructions properly limiting and defining the "especially heinous, atrocious or

cruel" aggravating circumstance in accord with *State v. Martin*, 303 N.C. 246, 278 S.E.2d 214 (1981), the jury found that the murder was especially heinous, atrocious or cruel. The jury found the following mitigating circumstances: (1) The defendant has no significant history of prior criminal activity; (2) The capital felony was committed while the defendant was under the influence of a mental or emotional disturbance; (3) The defendant is mentally retarded; (4) The defendant is easily influenced by others; (5) The defendant has difficulty thinking clearly when under stress; (6) Shortly after arrest, and at an early stage of the criminal process, the defendant voluntarily cooperated with the police by making a confession; and (7) The defendant has adapted to the disciplined environment of prison, and has committed no infractions during the period from 1983 to 1991.

In our proportionality review, we must compare the present case with other cases in which this Court has ruled upon the proportionality issue. This case is not particularly similar to any case in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. Each of those cases is distinguishable from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the evidence tended to show that the defendant hid in the bushes at a bank for about two hours waiting for the victim to make his nightly deposit. When the victim arrived at the bank, the defendant demanded the money bag. The victim hesitated, so the defendant fired a shotgun, striking him in the upper portion of both legs. The victim later died of cardiac arrest caused by the loss of blood from the shotgun wounds. The jury found only one aggravating circumstance, murder for pecuniary gain. The defendant also pleaded guilty during the trial and acknowledged his wrongdoing before the jury. *Benson* is easily distinguishable from the present case. In *Benson*, unlike in the present case, some evidence tended to show that the defendant did not intend to kill the victim because he shot him in the legs rather than a more vital part of his body. In addition, the jury here found two aggravating circumstances.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and several others planned to rob the victim's place of business. During the robbery, one of the assailants severely beat the victim, killing him. *Stokes* is also easily distinguishable from the present

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

case, because Stokes' co-defendant, whom the majority of this Court seemed to believe equally culpable with Stokes, was sentenced to life imprisonment. In addition, the jury in *Stokes* found only one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, while the jury here found that aggravating circumstance plus one additional aggravating circumstance.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the only aggravating circumstance found by the jury was that the murder for which Rogers was convicted was part of a course of conduct which included the commission of violence against another person or persons. In the present case, the jury found two aggravating circumstances—the murder was committed for the purpose of avoiding lawful arrest and that the murder was especially heinous, atrocious, or cruel.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home intending to rob and murder him. After gaining entry into the victim's home, the men killed the victim and stole his money. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary and that it was committed for pecuniary gain. In concluding that the death penalty was disproportionate, this Court distinguished that case from cases where the death sentence had been upheld. We focused on the failure of the jury in *Young* to find either the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, or the aggravating circumstance that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons. The present case is easily distinguishable from *Young* because, among other things, the jury found that the murder in this case was especially heinous, atrocious, or cruel.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the single aggravating circumstance found by the jury was that the murder was committed against a law enforcement officer engaged in the performance of his official duties. In the present case, the jury found two entirely different aggravating circumstances. *Hill* is easily distinguishable from this case in which the defendant and others "gang" raped and strangled an eleven-year-old child to death.

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant was on foot and waved down the victim as the victim passed in his truck. Shortly thereafter, the victim's body was discovered in his truck. He had been shot twice in the head and his wallet was gone. The single aggravating circumstance found was that the murder was committed for pecuniary gain. In contrast, the jury here found that the murder was committed for the purpose of avoiding lawful arrest and that the murder was especially heinous, atrocious, or cruel.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), the evidence tended to show that the defendant and a group of friends were riding in a car when the defendant taunted the victim by telling him that he would shoot him and questioning whether the victim believed that the defendant would shoot him. The defendant shot the victim, but then immediately directed the driver to proceed to the emergency room of the local hospital. In concluding that the death penalty was disproportionate there, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast, the jury in the present case found that the defendant and his friends killed the victim to prevent her from telling the police that they had raped her.

For the foregoing reasons, we conclude that each of the cases in which we have found the death penalty to be disproportionate is distinguishable from the present case. The present case bears little similarity to any of those cases.

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. If, after making such comparison, we find that juries have consistently returned death sentences in factually similar cases, we will have a strong basis for concluding that the death sentence under review is not excessive or disproportionate. If juries have consistently returned life sentences in factually similar cases, however, we will have a strong basis for concluding that the death sentence in the case under review is disproportionate.

The defendant relies on four cases in which the jury recommended life sentences: *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983); *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991);

*State v. Harris*, 319 N.C. 383, 354 S.E.2d 222 (1987); and *State v. Franklin*, 308 N.C. 682, 304 S.E.2d 579 (1983). We find each of those cases distinguishable from the present case.

In *Fincher*, the jury found the defendant guilty of first-degree murder on the theory of felony murder, premised upon the felony of rape. The jury, however, recommended a sentence of life imprisonment. At trial, the defendant presented psychiatric testimony which tended to show that he was mentally retarded and suffered from a schizophreniform disorder. Moreover, the defendant's mental illness caused a disturbance of his mood and behavior, sometimes to the extent that the defendant suffered from auditory hallucinations. The defendant in the present case does not suffer from a schizophreniform disorder. Further, unlike Fincher, who acted alone, the defendant in the present case acted with the assistance of three other males in raping and sodomizing the child victim and then assisted in killing her and hiding her body in order to avoid detection and arrest.

In *McKinnon*, the defendant was convicted of first-degree murder on the theory that the killing was committed during the course of second-degree rape and second-degree sex offense. The jury recommended a sentence of life imprisonment. Unlike McKinnon, the defendant in the present case acted with others in "gang" raping and killing an eleven-year-old child. In addition, the underlying felony supporting the defendant's conviction on the felony murder theory was first-degree rape and not second-degree rape as was the case in *McKinnon*.

In *Harris*, the defendant was found guilty of first-degree murder, premised upon the felony of attempted rape. The jury recommended life imprisonment. The evidence tended to show that the victim died as a result of multiple stab wounds. Unlike the defendant in *Harris* who attempted to rape the victim prior to killing her, the defendant in the present case and his friends "gang" raped and sodomized a child and then, acting together, strangled her so that she could not tell the police.

In *Franklin*, the defendant was found guilty of first-degree murder under the felony murder theory, premised upon first-degree sexual offense. The jury recommended a sentence of life imprisonment. According to the defendant's statement to law enforcement officers, he stabbed the victim several times after forcing her to perform oral sex. In contrast, the defendant in the present case

and his friends "gang" raped and sodomized a child and then, acting together to avoid detection, strangled her by shoving her panties on a stick down her throat.

For the foregoing reasons, we conclude that each of the cases relied upon by the defendant in which the jury recommended life imprisonment is distinguishable from the present case. The present case is not strikingly similar to any of those cases.

We also compare this case with the cases in which we have found the death penalty to be proportionate. Although we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, we have previously stated, and we reemphasize here, that we will not undertake to discuss or cite all of those cases each time we carry out that duty. *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Here, it suffices to say we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate. *E.g., State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987) (death sentence upheld where defendant stabbed and killed a seven-year-old girl during the commission of the felony of first-degree rape); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983) (first-degree felony murder conviction and death sentence upheld even though the jury found that the defendant was under the influence of mental or emotional disturbance when he committed the murder and that the defendant's capacity to appreciate the criminality of his conduct or to conform to the requirements of law was impaired).

All of the evidence presented in the present case was to the effect that the defendant and three other males "gang" raped and sodomized eleven-year-old Sabrina Buie while she begged them not to and called out for her "Mommy." The defendant then helped to hold Sabrina's arms while one of the other men took a stick, with Sabrina's panties attached to the end of it, and shoved it down her throat until she stopped breathing. The men next dragged Sabrina's body away from the crime scene and hid it in a field. After comparing this case carefully with all others in the pool of "similar cases" used for proportionality review, we conclude that it falls within the class of first-degree murders for which

we have previously upheld the death penalty. For the foregoing reasons, we conclude that the sentence of death entered in the present case is not disproportionate.

Having considered and rejected all of the defendant's assigned errors, we hold that the defendant's trial and capital sentencing proceeding were free of prejudicial error. Therefore, the sentence of death entered against the defendant must be and is left undisturbed.

No error.

Chief Justice EXUM concurring in part and dissenting in part.

I concur in the result reached by the majority on the guilt phase of this case. Given defendant's age, mental retardation, the compelling mitigating circumstances found by the jury and that juries in this state have consistently returned life sentences under similar circumstances, I believe that the death penalty here is excessive and disproportionate. I respectfully dissent from the majority opinion insofar as it sustains the imposition of the sentence of death and vote to remand the case for the imposition of a sentence of life imprisonment.

I recognize that defendant has been convicted of at least actively assisting in the commission of first-degree murder and that the crime was committed in an especially brutal manner against an especially vulnerable victim by defendant and three accomplices.[1] The crime cries out for punishment. If the defendant were a mature adult with full mental faculties rendering him capable of fully appreciating the wrongfulness of his act, and if the mitigating circumstances found were less compelling, I would conclude, as does the majority, that the death penalty is not disproportionate.

The question is not whether this mentally retarded defendant, nineteen years old at the time of the crime, will be punished; the question as always in these cases is which punishment will he receive—death or life imprisonment. Under the power given us by statute to determine whether a death sentence is excessive

---

1. Only one of defendant's accomplices, Leon Brown, was tried for the offenses, the other two apparently being juveniles. Leon Brown was convicted only of rape; he was not convicted of murder. *State v. Brown*, 83 CRS 15822, 15827 (Superior Court, Bladen County).

or disproportionate, I conclude the statute requires that this defendant be sentenced to life imprisonment.

I first note my disagreement with the majority's position that the jury might not have rejected the premeditation and deliberation theory of first-degree murder. I believe the record reflects that the jury rejected this theory and convicted defendant only on the felony murder theory.

The verdict form, which is partially reproduced in the majority opinion, appears in the record as follows:

STATE OF NORTH CAROLINA   )
                 VS                      )
HENRY LEE MCCOLLUM          )   V E R D I C T
                  defendant            )

We, the jury, return the unanimous verdict as follows:

1. GUILTY of FIRST DEGREE MURDER

    Answer: <u>yes</u>

                    IF YOU ANSWER "YES," IS IT:

                    A. On the basis of malice, premeditation and deliberation?

                         ANSWER: _____

                    B. Under the first degree felony murder rule?

                         ANSWER: <u>yes</u>

          OR

2. GUILTY of SECOND DEGREE MURDER

    Answer: _____

    OR

3. NOT GUILTY

    ANSWER: _____

This the <u>18</u> day of <u>Nov</u>, 1991.

                              s/ <u>Carl M. Moses</u>
                              FOREPERSON OF THE JURY

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

The form shows that the jury rejected verdicts of second-degree murder and not guilty by leaving the answer lines to these verdicts blank and returned a verdict of guilty of first-degree murder by writing "yes" in the answer line to this verdict. Just as clearly it seems to me, the jury rejected the premeditation and deliberation theory by leaving the answer line to sub-verdict "A" blank and convicted defendant solely on the theory of felony murder by writing "yes" on the answer line to sub-verdict "B."

It is true, as the majority states, that juries do not convict or acquit of theories; they convict and acquit of crimes, as we said in *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989). Here, for example, defendant has not been acquitted of first-degree murder; he has been convicted of it. Juries, however, do frequently reject some theories of guilt and accept others; and often it is necessary for purposes of appellate review to know which theories were rejected and which were accepted. The verdict form here was designed for that purpose, and the trial court instructed the jury that it might convict defendant of first-degree murder on either or both theories submitted. While the trial court also instructed the jury to write answers, either "yes" or "no," in all the blanks, I am satisfied, after considering the jury's responses to other answer lines on the verdict form, that the jury's leaving an answer line blank on this form is the equivalent of its writing "no" on that line.

I have no disagreement, however, with the result reached by the majority on the question of whether the evidence supports the aggravating circumstance that the murder was committed to avoid arrest. That the jury rejected the theory of premeditation and deliberation does not mean it could not have legitimately found the aggravating circumstance. The findings are not, as defendant seems to argue, mutually exclusive. A defendant can commit a murder for the purpose of avoiding arrest and still not premeditate and deliberate the killing.

N.C.G.S. § 15A-2000(d)(2) mandates that we consider whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). This requires a comparison of "the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

defendant's character, background, and physical and *mental condition.*" *State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985) (emphasis added). A comparison of this case to those in other capitally tried cases in our proportionality pool in which both crimes and defendants are similar to the crime and defendant in the instant case compels the conclusion that the sentence of death here is excessive and disproportionate.

Defendant was convicted of felony murder based on the underlying felony of rape. The evidence tended to show the murderous act itself was committed by someone other than defendant, although defendant actively assisted by holding the victim and was clearly guilty as an aider and abettor. At the time of the crime defendant was nineteen years old. He suffered from mental retardation and functioned at a mental age of eight to ten years. Defendant's intelligence quotient (IQ), which was tested on two different occasions, was scored at 61 and 69. Achievement test results showed defendant functioned at a third grade level with the reading comprehension level of a second grader.

At sentencing, the jury found two aggravating circumstances — that the murder was committed to avoid arrest and that it was especially heinous, atrocious or cruel. It also found seven mitigating circumstances — no significant history of prior criminal activity, commitment of the felony murder under the influence of mental or emotional disturbance, that defendant was mentally retarded, that he was easily influenced by others, that he had difficulty thinking clearly under stress, that he cooperated with police, and that he had adapted to his prison environment. Notwithstanding, the jury recommended a sentence of death.

Upon reviewing prior felony murder convictions based on acts similar in nature to the instant case and perpetrated by defendants having similar characteristics to those of defendant McCollum, I am compelled to draw the conclusion that a sentence of death under these circumstances is disproportionate.

Of all capital cases involving felony murder convictions with an underlying felony of a sex offense, only five have involved defendants who were less than or equal to twenty years of age. All five of these cases resulted in a jury recommendation of life imprisonment. *State v. Jenkins,* 311 N.C. 194, 317 S.E.2d 345 (1984) (seventeen-year-old defendant); *State v. Fincher,* 309 N.C. 1, 305

S.E.2d 685 (1983) (eighteen-year-old-defendant); *State v. Hunt*, 324 N.C. 343, 378 S.E.2d 754 (1989) (twenty-year-old defendant); *State v. Forney*, 310 N.C. 126, 310 S.E.2d 20 (1984) (nineteen-year-old defendant).

Defendant was also found to be mentally and emotionally disturbed at the time of the offense. In sexual offense felony murder cases where evidence of mental and emotional disturbance on the part of the defendant has been present, juries have repeatedly recommended life imprisonment even where the defendant was the actual perpetrator of an especially heinous, atrocious or cruel killing. *State v. Thomas*, 332 N.C. 544, 423 S.E.2d 75 (1992) (mentally or emotionally disturbed defendant sentenced to life imprisonment for felony murder of victim even though jury found killing to be especially heinous, atrocious or cruel); *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991) (jury recommended life sentence for emotionally and mentally disturbed defendant who raped and murdered victim under especially heinous, atrocious or cruel circumstances); *State v. Flack*, 312 N.C. 448, 322 S.E.2d 758 (1984) (emotionally, mentally disturbed defendant sentenced to life imprisonment for the especially heinous and atrocious strangulation, beating and sexual assault of eighty-eight-year-old woman); *State v. Forney*, 310 N.C. 126, 310 S.E.2d 20 (1984) (codefendant of *Flack* also found to be emotionally, mentally disturbed and sentenced to life imprisonment).

While here the jury did not find that defendant's capacity to appreciate the wrongness of his act and to conform his conduct to the requirements of law was impaired, it did find, along with six other mitigating circumstances, that defendant was mentally retarded. Significantly, where a jury of this state has been charged in the past with the task of capitally sentencing a defendant whom it found to be mentally retarded, it has recommended life imprisonment. *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1984). In *Fincher* the defendant was convicted of first-degree murder on the theory of felony murder based on the underlying felony of rape. Unlike defendant McCollum, defendant Fincher actually committed the murderous act. *Id.* at 13, 305 S.E.2d at 693. Similar to defendant McCollum, however, Fincher was a mentally retarded seventeen-year-old, suffering from a schizophreniform disorder, with an IQ measured at 50 and 65. *Id.* at 7, 305 S.E.2d at 690. As in this case, the jury found as an aggravating circumstance that the murder was heinous, atrocious or cruel and as a mitigating circumstance

STATE v. McCOLLUM

[334 N.C. 208 (1993)]

that the murder was committed while the defendant was mentally or emotionally disturbed. The jury returned a sentence of life imprisonment.

Of fifteen cases involving a capitally tried defendant in which there was evidence that the defendant was mentally retarded, I have found only one, *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988), where this Court sustained a sentence of death. Significantly, in *Spruill* the jury rejected this evidence and refused to find the mental retardation mitigating circumstance submitted to it. Indeed, the jury failed to find any mitigating circumstances at all.

In its proportionality review, the majority has relied on two cases, *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), and *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), both of which I find quite unlike the case at bar. In *Zuniga* the defendant was sentenced to death for the stabbing and killing of a seven-year-old girl during the commission of the felony of first-degree rape. Unlike the present case, defendant Zuniga was convicted of first-degree murder on the theory of premeditation and deliberation. At the time of the offense, Zuniga was twenty-seven years old; and there was no evidence of, nor did the jury find the existence of, any mental or emotional disturbance or mental impairment on the part of the defendant. In *McDougall*, the defendant, who was twenty-five, was convicted of first-degree felony murder and sentenced to death even though the jury found the defendant was under the influence of a mental or emotional disturbance at the time the offense was committed. However, unlike the instant case, there were two underlying felonies — kidnapping and rape — instead of the one felony of sex offense. After voluntarily injecting cocaine, the defendant in *McDougall* tricked two women into letting him into their home before he "commenced a campaign of terror against [them], cutting, stabbing and slashing them with a butcher knife." 308 N.C. at 37, 301 S.E.2d at 319. The *McDougall* jury found the existence of three aggravating circumstances, one of which was the defendant's prior conviction for the felony of rape. The jury in the present case found as a mitigating circumstance that defendant had no prior history of criminal activity.

We said in *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), that if, after making the comparisons with similar

cases, considering both the crimes committed and the defendants who committed them,

> we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

In cases like the one before us, considering both the crime and the defendant, juries have consistently been returning verdicts of life imprisonment. I conclude, therefore, that the sentence of death against this defendant is disproportionate under N.C.G.S. § 15A-2000(d)(2).

I also believe that a strong argument can be made that the imposition of the death penalty upon a defendant whom the jury finds to be mentally retarded constitutes cruel or unusual punishment violative of Article I, Section 27, of the North Carolina Constitution, which provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."

"The law's humanity would seem to dictate that rarely if ever should death be the appropriate punishment for a defendant who kills under the influence of a mental or emotional disturbance and whose capacity to appreciate the wrongness of his act and to conform his conduct to the requirements of law is impaired. Punished he should be. But *execution of a defendant whose crime is the product of a mentally and* emotionally defective personality and who suffers from an incapacity to control his conduct is excessively vindictive." *State v. Rook*, 304 N.C. 201, 246-47, 283 S.E.2d 732, 759 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982) (Exum, J., now C.J., dissenting) (emphasis supplied).

Recently the United States Supreme Court visited the question whether execution of the mentally retarded violated the United States Constitution's prohibition in the Eighth Amendment of "cruel and unusual punishment"; by a five to four majority, the Court concluded that it did not. *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989). A great deal that can be said on this issue

was said in the opinions delivered in that case. The Amicus Curiae Brief filed in *Penry* by the American Association on Mental Retardation, The American Psychological Association, the Association for Retarded Citizens of the United States, and other organizations with expertise on the subject is compelling. So is information contained in Conley, Luckasson and Bouthilet, *The Criminal Justice System and Mental Retardation* (Paul H. Brooks 1992), containing a forward by Dick Thornburgh written when he was Attorney General of the United States, published since, and critical of, the decision in *Penry*.

The four dissenters in *Penry* make a powerful case for the proposition that execution of the mentally retarded violates the Eighth and Fourteenth Amendments. We, of course, are bound by the majority's decision in *Penry* that it does not insofar as the federal document is concerned. We are able to decide, however, that such executions violate our state's constitutional prohibition against cruel or unusual punishments.

Defendant, however, did not raise this argument at trial nor on appeal; and it has not been briefed or argued in this case. The question, therefore, is not properly before us; and until it has been briefed and argued, I am unwilling to address it definitively.

Justice Frye joins in this concurring and dissenting opinion.