An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1072

Filed 18 March 2026

Pitt County, Nos. 23CR001362-730, 23CR001363-730, 23CR001364-730

STATE OF NORTH CAROLINA

v.

QUINTIN DEANDRE HAIRSTON

Appeal by defendant from judgments entered 25 June 2024 by Judge Cy A. Grant, Sr., in Pitt County Superior Court. Heard in the Court of Appeals 13 August 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General I. Faison Hicks, for the State.*
>
> *Attorney Drew Nelson, for defendant-appellant.*

FREEMAN, Judge.

Defendant appeals from judgments entered upon a jury verdict of guilty on the charges of: felony conspiracy to commit robbery with a dangerous weapon; two counts of robbery with a dangerous weapon; assault with a deadly weapon with the intent to kill inflicting serious injury; attempted first-degree murder; and first-degree burglary. On appeal, defendant argues the trial court erred by failing to intervene *ex*

*mero motu* during the State's closing argument. After careful review, we conclude because defendant has failed to show that the prosecutor's statements were so grossly improper as to amount to prejudicial error, defendant has also failed to show the trial court abused its discretion by not intervening *ex mero motu* during the State's closing argument.

## I.  Procedural and Factual Background

In July 2020, defendant, Zyquez McMillan, Micah Mims, and Reginald Miller planned to rob their acquaintance, Colin Shouse, after being told that Colin kept fifteen thousand dollars in his Greenville duplex. On 14 July 2020, Zyquez drove from Winston-Salem and picked up defendant, Micah, and Reginald. Zyquez brought a handgun, BB gun, shotgun, and duffel bag in the trunk of his car. That day, the four of them planned to drive to Greenville to rob Colin in his home, but while driving from Winston-Salem to Greenville, Zyquez's car broke down.

Zyquez called his girlfriend, Danielle Dwiggins, and asked if she could pick up the group. Danielle agreed, and at the group's request, she continued driving them to Colin's duplex.

Between nine and ten  that night, Patrick Thigpen, Colin's cousin, came over to Colin's duplex to "hang out." While there, Patrick lay down on the couch and watched YouTube videos. Colin cooked pizza rolls in the kitchen. No one else was home, and no one was home in the adjoining duplex.

The group arrived at Colin's duplex around midnight. Zyquez grabbed the handgun and BB gun, Micah grabbed the duffel bag, and defendant grabbed the shotgun. Zyquez walked to a window near the front door, where he remained until the group left. Defendant, Reginald, and Micah exited Danielle's car and walked into the house.

Patrick was still lying on the couch, and Colin was still in the kitchen when defendant, Reginald, and Micah entered the home. Micah carried a duffel bag; defendant carried a shotgun. Two of the men approached Colin, and one of the men held a shotgun to Colin's face. Colin held his hands up in the air and did not resist.

At the same time, someone from the group ordered Patrick to roll over and put his head in the couch, and he complied. At trial, Patrick described he could feel a gun pressed to the back of his head. One of the men took Patrick's phone, told Patrick not to move, and demanded that Patrick tell Colin to give "them whatever they want[ed]." Patrick pleaded with the men not to kill him, told them they could take whatever they wanted, and told Colin to let them take whatever they wanted.

While Patrick's head remained buried in the couch, he heard "rummaging" and the men moving toward Colin's room. Micah, who was carrying the duffel bag, and defendant, who was carrying the shotgun, dragged Colin from the kitchen to Colin's bedroom.

The two men threw Colin on the ground of his bedroom and screamed at him to show them where his safe was located. Colin attempted to open the safe but was

unable to open it electronically due to a battery issue. Colin told the men he had to "get the key to open it[,]" and defendant, while still holding the shotgun to Colin's face, screamed at him to "quit playing . . . games!"

Colin found the safe key and opened the safe. Micah crouched towards the safe with the duffel bag, while defendant continued to hold the shotgun pointed at Colin's head. The men urged Colin to move the money in the safe—"roughly a couple of thousand dollars"—into the duffel bag. The shotgun remained pointed in Colin's face, and the men prompted Colin to lie face down on his stomach. The men continued to yell and question Colin regarding "the rest of" the money that could be in the house.

Simultaneously, in the living room, one of the men pulled Patrick's shirt over his head, stood Patrick up, and moved Patrick to the end of the couch. Patrick sat down on that end of the couch when the man urged Patrick to reveal where things were located in the home. Patrick continued to tell the man to "take whatever you want" and that he could "have everything." One of the men stood Patrick up again and hit him over the head with something, causing Patrick to fall to the floor. Patrick lay face down and pretended to be dead. Moments later, Patrick heard a loud noise coming from Colin's bedroom, feet running, and the sound of a door closing. All of the men, including Zyquez, who was still waiting outside near Colin's front door, ran to Danielle's car.

Patrick waited until he felt the men had left, screamed for Colin, and after hearing no response, got up and went to Colin's bedroom. Upon entering Colin's

bedroom, Patrick described Colin lying face down, and there was "a lot of blood." Patrick put a towel over Colin's face and tried to reassure him that everything was okay. Because the men took both Patrick's and Colin's phones, Patrick searched for a way to get help. After being unable to find his car keys or phone, Patrick ran outside, screamed for help, and urged a neighbor to call 911. Colin survived but suffered severe injuries, including the loss of sight and smell—which still persist despite multiple required surgical operations he has undergone.

As the men got into Danielle's car, they began arguing, and Reginald asked defendant, "why did you shoot him?" Danielle got gasoline nearby, and then the group headed back to Winston-Salem. During their drive, they stopped once, and defendant threw his clothes out of the car. When the group split what they had taken from Colin's duplex, Danielle received $200, Zyquez received $200 and THC wax, and Micah received $400.

On 25 September 2023, defendant was indicted for felony conspiracy to commit robbery with a dangerous weapon, two counts of robbery with a dangerous weapon, assault with a deadly weapon with the intent to kill inflicting serious injury, attempted first-degree murder, and first-degree burglary. Defendant's matter came on for trial on 24 June 2024. Defendant pleaded not guilty to each charge, did not testify at trial, and did not put on any evidence.

The State presented in its closing argument the elements of each of defendant's charges. During the State's closing argument, when discussing defendant's charge of

attempted first-degree murder, the prosecutor stated, "[j]ust the thought of a loaded shotgun put to your head." Further, at the end of the State's closing argument, the prosecutor stated to the jury:

> I do want to ask you one thing. Would this be enough for you? If your son was sitting beside you with his face blown off and you heard this evidence would it be enough for you to say this person did it and is guilty? Is this enough for you as a parent, as a grandparent, as an uncle, as a brother, as a cousin; is this evidence enough for you? I submit to you, Ladies and Gentlemen, it is.

Throughout trial and after the parties' closing arguments, the trial court instructed the jury how to treat the evidence presented and attorney's arguments, and their duties. For example, the trial court made statements to the jury like, "[i]f your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection[,]" and "[i]t is your duty to find the facts and to render a verdict reflecting the truth."

On 25 June 2024, defendant was found guilty of all charges and sentenced to six separate sentences of 157–120, 73–100, 64–89, 25–42, 64–89, and another 64–89 months' imprisonment to run consecutively. On 25 June 2024, defendant orally appealed.

## II. Jurisdiction

Because this Court has jurisdiction to review "any final judgment of a superior court, other than one based on a plea of guilty or nolo contendere," N.C.G.S. § 7A-27(b)(1) (2025), and because "[a] defendant who has entered a plea of not guilty

to a criminal charge, and who has been found guilty of a crime, is entitled to appeal as a matter of right when final judgment has been entered[,]" N.C.G.S. § 15A-1444(a) (2025), we have jurisdiction over defendant's appeal of right.

### III.    Standard of Review

"[O]ur standard of review dictates that only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Goins*, 377 N.C. 475, 478 (2021) (citation omitted).  Therefore, "[t]he standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133 (2002).

### IV.    Discussion

Defendant argues that the State "improperly asked members of the jury to place themselves in [Colin] Shouse's 'shoes' "; therefore, "[t]he trial court erred by failing to intervene *ex mero motu* during the [S]tate's closing argument." We disagree.

"This Court will not disturb the trial court's exercise of discretion over the latitude of counsel's argument absent any gross impropriety in the argument that would likely influence the jury's verdict."  *State v. Lloyd*, 354 N.C. 76, 113 (2001) (citation omitted). Our Supreme Court has articulated:

> It is not enough that the prosecutors' remarks were undesirable or even universally condemned. For an appellate court to order a new trial, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*Goins*, 377 N.C. at 478 (citation omitted).

A "defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair" to demonstrate that the trial court abused its discretion. *State v. Waring*, 364 N.C. 443, 499–500 (2010) (cleaned up). Therefore, a "defendant has the burden to show a reasonable possibility that, had the error[s] in question not been committed, a different result would have been reached at the trial." *Goins*, 377 N.C. at 478 (alteration in original) (cleaned up).

"Our Supreme Court has held that 'arguments that ask the jurors to place themselves in the victim's shoes are improper.' " *State v. Barker*, 294 N.C. App. 596, 602 (2024) (alteration omitted) (citing *State v. Prevatte*, 356 N.C. 178, 244 (2002)); *see also State v. McCollum*, 334 N.C. 208, 224 (1993) ("An argument asking the jurors to put themselves in place of the victims will not be condoned . . . ." (cleaned up)). However, a "[g]rossly improper argument is defined as conduct so extreme that it renders a trial fundamentally unfair and denies the defendant due process." *State v. Fair*, 354 N.C. 131, 153 (2001). Thus, "[w]hen evaluating the prejudicial effect of an improper closing argument, we examine the statements in context and in light of the

overall factual circumstances to which they refer." *Goins*, 377 N.C. at 479 (cleaned up). For example, our Supreme Court has explained we can "consider the entirety of the closing argument, the evidence presented at trial, and the instructions to the jury." *Id.*

Presuming without deciding the State's statements were improper, here, the prosecutor's statements made up a small portion of his closing argument and the State described to the jury each element and the evidence to support each of defendant's charges; overwhelming evidence of guilt was presented at trial where Patick, Colin, and other participants in the robbery testified to defendant's actions; and, the trial court repeatedly instructed the jury to find the facts, defer to the evidence, and weigh the evidence. Accordingly, defendant has failed to demonstrate "that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Waring*, 364 N.C. at 499–500 (cleaned up). Therefore, the trial court did not abuse its discretion by failing to intervene *ex mero motu*.

## V. Conclusion

Because defendant has failed to show that the prosecutor's statements were so grossly improper as to amount to prejudicial error, defendant has also failed to show that the trial court abused its discretion by not intervening *ex mero motu* during the State's closing arguments.

NO ERROR

Judges STROUD and FLOOD concur.

Report per Rule 30(e).